Deborah Anne TAYLOR (Mitten),
Plaintiff–Appellant,

v.

David Steve TAYLOR, Defendant–
Appellee.

Supreme Court of Tennessee,
at Jackson.

Feb. 22, 1993.

## OPINION

DAUGHTREY, Justice.

In this child custody dispute, we are asked to reverse an order by the trial court prohibiting the custodial parent in this case, Deborah Taylor Mitten, from moving out of state with her three-year-old daughter, Brittney, over the objection of the non-custodial parent, David Steve Taylor. The resolution of this dispute requires a reassessment of the procedural rules established in a trilogy of recent cases, beginning with our opinion in *Seessel v. Seessel*, 748 S.W.2d 422 (Tenn.1988). Because we find that Deborah Mitten should have been allowed to move with the child to Davenport, Iowa, where her new husband had established residence while attending school, we reverse the order of the trial court denying permission to remove, as well as the judgment of the Court of Appeals affirming that order. We also take this occasion to announce more precisely the procedure that should be followed and the standards that will apply in cases of this nature in the future.

## I. *Factual and Procedural Background*

The facts in this case are largely undisputed. Deborah and Steve Taylor were married in early 1987 and had a daughter, Brittney, in August of that year. The marriage proved to be an unhappy one and the parties separated in September 1988. They secured a divorce based on irreconcilable differences in May 1989, when Brittney was not yet two years old. By agreement, Deborah Taylor was awarded custody of Brittney, and Steve Taylor was given visitation privileges for two days a week and every other weekend.

There was nothing in the decree that prohibited Deborah Taylor from moving out of state with Brittney. Nevertheless, in October 1989, several months after the decree of divorce became final, she filed a petition asking the trial court to "modify visitation" so that she could move with Brittney to Montana to live with her parents and attend school there. In response, Steve Taylor filed a counter-petition for change of custody. There was a hearing on the matter in December 1989, at which time the judge apparently denied both petitions, although no order was entered to that effect. The parties agree, however, that the trial judge made two rulings at the hearing, finding that it was in the child's best interest for the mother to retain custody but prohibiting her from taking the child to Montana.

In June 1990, Deborah Taylor married Mark Mitten and made plans to move to Davenport, Iowa, where he was enrolled in chiropractic school. Mark Mitten had already established what has been described as a "wonderful relationship" with his new step-daughter during trips between Memphis and Davenport. The Mittens rented a home in Davenport for the family and made daycare arrangements for Brittney. Deborah Mitten secured a new job at a local hospital as a phlebotomist, the same profession she had followed in Memphis.

Mark Mitten then made a special trip to Memphis to meet Brittney's father, to apprise Steve Taylor of the planned move and to "let him get to know the man who was Brittney's new step-father." Steve Taylor told Mark Mitten that Brittney talked about Mitten frequently and seemed to like him very much, but Taylor refused to consent to changing the visitation schedule so

that Brittney could move to Iowa with her mother and step-father.

In November 1990, Deborah Mitten filed a petition to remove the child from Memphis to Davenport. In response, Steve Taylor once again filed a petition for change of custody, precipitating a full hearing in the trial court. At that hearing, Deborah Mitten denied any intent to prevent Brittney from seeing her father and his family, and she expressed her desire to co-operate in setting up a revised visitation schedule. Naturally, it would have permitted fewer visits between Brittney and her father than had occurred in Memphis, but it undoubtedly would have provided for visits of longer duration than they had enjoyed in the past.[1]

The trial court found that it was in the child's best interest to remain in Deborah Mitten's custody, but, once again, the trial judge denied her request to move Brittney out of state.

We were advised at oral argument that, as the result of the trial court's ruling, Deborah Mitten is now living in an apartment in Memphis with Brittney and a new child, born of her marriage to Mark Mitten, while he continues to live in Davenport and attend school there, separated from his wife, his step-daughter, and his own infant child. We are thus faced with what has to be considered the worst of several possible alternatives: Brittney's parents' relationship is no longer intact, having been severed by divorce, but her mother's relationship with her step-father has been hampered, and the new family is likewise not an intact unit. Brittney remains in Memphis, but in the custody of a mother who is forced to stay there by her ex-husband's refusal to let her take Brittney to Iowa and set up a stable home for her there, and by a court order finding that this situation is in the child's "best interest."

The trial judge in his written order, made the following specific findings:

> The court further finds that the proper legal standard to be applied in this cause is to determine what is in the manifest best interest of the minor child. Although the mother has remarried and petitioned the Court for permission to move to Davenport, Iowa, where her husband intends to reside for at least two and one-half ($2\frac{1}{2}$) years, the Court finds that the situation essentially is unchanged from that which existed on December 15, 1989, at which time the Court heard and denied a prior petition by the mother seeking permission to move with the minor child to the State of Montana. The circumstances are that, except for the maternal grandparents who have relocated from the Memphis area to the State of Montana, all extended family members of both parents still live in in the Memphis area. There are no members of the extended family living in Davenport, Iowa, and *the only advantage to the minor child of such a move would be that she would be in a complete family.* [Emphasis added.] The disadvantage of allowing the move would be that the father and all other members of the minor child's extended family would be denied ordinary visitation.

> The Court finds that there has been regular contact between the minor child and the father, David Stephen Taylor, in that the father sees the child two days every week, as well as every other weekend. The Court further finds that the paternal grandparents and at least one paternal uncle have frequent visitation and contact with the minor child and that one cousin of her own age has a very close relationship with the minor child. The Court finds it would not be in the best interest of the minor child for those regular contacts to be severed.

It would be easy enough simply to reverse the judgment in this case, finding that the arrangement produced by the trial court's order was not in the child's best interest, and that the advantage to Brittney of "being in a complete family" outweighs the advantage of uninterrupted contact with her extended family and "ordinary

---

1. There was testimony by Brittney's mother that Steve Taylor had missed his scheduled visits on some 20 occasions. He apparently conceded this fact, but defended his conduct on the basis of an erratic schedule at Federal Express, which often required him to work at night.

visitation" with her father. Our call on the child's "best interest" in this respect would be final and unappealable, and the new family unit—composed of Mark and Deborah Mitten and their two children—could finally take up residence together and, subject to a reasonable visitation schedule for Brittney and her father, get on with the business of life. The problem with treating this case merely on its facts, however, is that the resulting opinion would do nothing to clarify existing law or prevent such an unfortunate situation as occurred here from occurring again in the future.

Nor would it give the lawyers of Tennessee a predictable basis upon which to advise clients, who face custody disputes of this kind and seek guidance in an effort to avoid litigation.

## II.  *Tennessee Law Prior to Seessel*

The question of a custodial parent's legal authority to remove a child from the jurisdiction of the court that initially awarded custody, although widely litigated elsewhere in the country, has received scant attention in Tennessee until the last decade.  In the 19th century, of course, the common law here, as elsewhere, gave the father an absolute right to the custody of his children; a mother who wished to leave the marital home, let alone the marital jurisdiction, could do so only at the cost of losing any parental rights she might have had, by operation of law.  *See, e.g., State ex rel. Paine v. Paine,* 23 Tenn. (4. Hum.) 523 (1843); *Smith v. Smith,* 188 Tenn. 430, 220 S.W.2d 627 (1949); *Stubblefield v. State ex rel. Fjelstad,* 171 Tenn. 580, 106 S.W.2d 558 (1937).

After the turn of the century, courts determining questions of child custody began to focus less on "the technical legal right of the father to . . . possession [of his children], to use them at once, or at some future day, when grown older for the benefit of their services," and more on the welfare of the children, especially where "the person who invokes the aid of the court is the mother of the children, and a worthy woman."  *Kenner v. Kenner,* 139 Tenn. 211, 221, 201 S.W. 779, 782 (1918). This principle, said the Tennessee Supreme Court at the time, is one whose "just, elevated and humane sentiments must find response in the bosom of every right-thinking man," being based on the notion "that children are not chattels, but intelligent and moral beings, and that as such their welfare and their happiness is a matter of first consideration."  *Id.*

Eventually, of course, the pendulum swung to the opposite extreme.  For most of this century, a mother was presumed by law to be the proper custodian of minor children, especially those of "tender years," and a father had little hope of gaining custody unless he could show that the mother was "unfit."  Within the last decade or two, as the value of involving both parents in child-rearing has become widely recognized, the development of the law across the country has reflected a growing awareness that after divorce, the custodial parent should not be allowed to interfere with the non-custodial parent's opportunity to establish and maintain a close relationship with his or her children, despite the break-up of the marital residence.

Nevertheless, the law in this state prior to 1988 recognized, as did that of most other states, that in the absence of a court order restricting their movement, the custodial parent and the child were free to move to another jurisdiction.[2]  Thus, in *Ev-*

---

**2.** The general rule is so stated in most legal compilations and annotations.  *See, e.g., In re Marriage of Lower,* 269 N.W.2d 822, 825 (Iowa 1978), quoting 24 Am.Jur.2d *Divorce and Separation* § 797, as follows: "If a decree grants custody of a child to a parent who resides within the jurisdiction of the court, but the decree is silent concerning the place where the child is to live, the custodian may, in the absence of a statute to the contrary, remove the child from the state."  *See also Jordan v. Jordan,* 50 Md. App. 437, 446, 439 A.2d 26, 31 (1982) ("The great weight of authority in this country permits a minor child to move freely with the custodial parent."), and other cases collected at 154 A.L.R. 553.  The only exception to the general rule involves removal of a child by the custodial parent to a foreign country, but even in that circumstance, the overwhelming number of courts have permitted removal, even retroactively.  *See, e.g., Bozzi v. Bozzi,* 177 Conn. 232, 413

*ans v. Evans*, 125 Tenn. 112, 140 S.W. 745, 746 (1911), the court was asked to determine the liability of the non-custodial parent, in this case the father, for the support of his daughter, who was living with her mother in New York. The Court rejected the father's argument that he should be relieved of his obligation because he had been deprived of the control of his children and the "right to keep them at home," noting:

> The custody of this child was entrusted to her mother. Evans [the father] has no voice as to where she shall reside; but, by decree of court, the mother is made the arbiter of such matters.

Likewise, in *Thomas v. Thomas*, 206 Tenn. 584, 335 S.W.2d 827 (1960), the Court was asked to relieve the non-custodial parent (again the father) of the obligation to support his minor children because they had been taken to Texas following their mother's remarriage, and he was no longer able to exercise his visitation privileges. Following precedent, the Court held that "the mother had the right to control the child's whereabouts and the father had no voice where the child should reside and could not make his duty to support the child depend upon the place of the child's abode." *Id.* 335 S.W.2d at 828, citing *Evans v. Evans, supra.* The Court further noted that "[t]he mere fact that the decree grants the other parent the right of visitation does not implicitly prohibit the removal of the child from the jurisdiction" and observed:

> The father ... [alleges] in effect that he has the right to fix the residence of the children in Tennessee, and in turn, to

force the mother to leave her second husband and return to Tennessee with the children and thereby destroy her second marriage.... He bases his demand that they return to Tennessee solely on his personal desire, without regard for the welfare of the children, or the right of the mother to pursue her own happiness and live with her second husband and fulfill her obligations and marital vows to him, which the law requires her to do.

*Id.*

In regard to custody decrees that do, in fact, restrict the removal of minor children unless the custodial parent secures judicial authorization, the Court of Appeals held in 1983 that the decision to grant or deny removal should be based on a discretionary "find[ing] that it is in the best interest of the child to allow removal." *Walker v. Walker*, 656 S.W.2d 11, 17 (Tenn.App.1983). Further, the Court of Appeals held "that in the typical situation where the court in awarding custody enjoins the custodial parent from removing the children without the court's permission, the burden of showing that the move is in the best interest of the children should be on the custodial parent seeking relocation."[3] *Id.* On the other hand, the Court of Appeals indicated in dictum, "in the situation where no injunction has been issued in the award of custody, the parent contesting the relocation should bear the burden of showing that the relocation is *not* in the best interest of the children." *Id.* at 17–18 (emphasis added).

Citing *Walker v. Walker* in a later opinion, the Court of Appeals further held that

---

A.2d 834 (1979), and other cases collected at 30 A.L.R.4th 548 (1984).

As a corollary to this rule, the custodial parent normally has the right to decide the residence of the child. *See Meier and Meier*, 36 Or.App. 685, 685, 585 P.2d 713, 716 (1978), rev'd on other grounds, 286 Or. 437, 595 P.2d 474 (1979); *Bernick v. Bernick*, 31 Colo.App. 485, 505 P.2d 14, 15 (1972); *Long v. Long*, 127 Wis.2d 521, 381 N.W.2d 350, 356 (1986). As the *Meier* court noted: "Choice of residence is a parental decision which the custodial parent should be able to make without judicial second-guessing, supervision or dictation unless that choice is made for ulterior motives such as to defeat the rights

of the noncustodial parent to visitation." 585 P.2d at 716. *Accord, Auge v. Auge*, 334 N.W.2d 393, 399 (Minn.1983), quoted *infra*, at page 332.

**3.** In *Walker*, the original restriction was tied specifically to the rescheduling of visitation. As noted in the opinion, the trial court "place[d] the custody of the children in Mrs. Walker, with the understanding that she will be enjoined from removing those children from the jurisdiction of this Court until such time as she petitions this Court and notifies Mr. Walker and his attorney, ... at which time we can work out a visitation schedule regarding the children...." *Id.*

a parent who is granted custody without restrictions on removal cannot be held in contempt of court for leaving the state with the minor without having secured the court's permission. *Arnold v. Gouvitsa,* 735 S.W.2d 458, 463 (Tenn.App.1987). Pointing out that in such a situation, the non-custodial parent has the burden of proving that removal was not in the best interest of the children, the court in *Arnold v. Gouvitsa* followed not only the controlling case law in Tennessee, but also the rule in a significant majority of other jurisdictions.

### III. *The Seessel–Rogero–Nichols Trilogy*

That majority rule was abandoned, in Tennessee at least, in *Seessel v. Seessel,* 748 S.W.2d 422 (Tenn.1988). There, the custodial parent filed (perhaps unnecessarily in view of *Thomas, Walker,* and *Arnold* ) a petition to remove the minor child of the parties to Denver, Colorado, for a reason or reasons not stated in the opinion. *Id.* at 422. The trial court ruled that removal was not in the child's best interest, but again, the evidentiary basis is not indicated. *Id.* The Court of Appeals reversed, concluding that "there was not any indication that allowing Mrs. Seessel to take her son to Denver would be adverse to his best interest." *Id.*

We granted review in *Seessel,* "in order to correct a misapprehension of the law in this State in reference to the burden of proof involving the relocation and removal of minor children from the jurisdiction of a court which has granted a divorce and awarded custody." *Id.* at 423. Based on an unreported decision of the Court of Appeals, which we characterized as "the better rule," *id.* at 423,[4] we held that the Court of Appeals in *Seessel* had erred in ruling that a non-custodial parent in a removal dispute has the "burden of proving that the relocation is not in the child's best interest," and we "overrule[d] the court below and so much of *Walker,* supra, and its progeny, holding to the contrary." *Id.* at 424. The case was remanded to the trial court for further proceedings, with a specific direction that the non-custodial parent, who had filed a petition for change of custody, should bear the burden of proving a change of circumstances sufficient to warrant modification, and that the custodial parent, who had filed the petition for permission to remove, should have the burden of proving that the move to Denver was in the child's best interest. *Id.*

In *Seessel,* the Court was concerned principally with allocation of the burden of proof. Because the details of the original custody decree are not included in the opinion, *Seessel* 's effect on the long-standing Tennessee rule, set out in *Evans* and *Thomas,* that a custodial parent need not seek court approval to remove a minor child to another jurisdiction where there is no restriction on removal in the original decree, would ordinarily be in doubt. However, in overruling that portion of *Walker* that purported to put the burden of proof on the non-custodial parent to restrain removal in such a circumstance, the opinion impliedly had the effect of overruling *Thomas,* albeit *sub silentio.*

Likewise, because of its emphasis on the allocation question, *Seessel* also omitted any discussion of what principles or policies

**4.** Quoting from the unreported case, the *Seessel* opinion sets out material now found at 24 Am. Jur.2d, *Divorce and Separation* § 989 (1983). That entry contains the material quoted in *Seessel,* to this effect:

The question whether the court shall permit or prohibit the removal of the child rests within its sound judicial discretion. The general rule that in matters affecting the custody of a child the court will be governed primarily by the welfare and best interests of the child applies in determining whether to permit or prohibit removal of the child from the jurisdiction.

What is omitted from the quotation in *Seessel* is the remainder of the paragraph set out above. It reads as follows:

Thus, in view of the policy that a child of tender years should be entrusted to the care of the mother, and that the welfare of the child is the controlling factor, the court may expressly authorize the mother to take the child to another jurisdiction, where she has married again, her husband has a position in another state, and a good home will be provided there.

*Id.* (citing *Mercer v. Foster,* 210 Ga. 546, 81 S.E.2d 458 (1954), and *Griffith v. Griffith,* 240 N.C. 271, 81 S.E.2d 918 (1954)).

should guide the trial court in deciding whether or not removal was in a child's best interest. A few months later, however, we were faced with review of a removal dispute in which both the trial court and the intermediate appellate court had refused to permit the custodial parent of two young children to leave Knoxville and move back to her hometown, Dayton, Ohio, where she planned to remarry. *Rogero v. Pitt*, 759 S.W.2d 109 (Tenn.1988). In this second case, we did discuss the facts in the record, thus giving some hint of what factors the courts should consider in deciding the removal issue.

First of all, the *Rogero* opinion indicates that "the desire of the wife [sic] to remarry was a legitimate reason for removal." *Id.* at 111. We also noted that even though the parents had been awarded joint custody, "the children [had] spent most of their time with their mother, and that she had the responsibility of most of the major decisions concerning their regular activities and their education." *Id.* In addition to finding that the mother was the children's primary caretaker, the Court also noted that "she ha[d] been shown to be a fit person in every respect."[5] *Id.* at 112. We also set out the provision in T.C.A. § 36-6-101(d) that permits the courts to consider the "tender years doctrine" in examining questions of custody.[6] Further, we noted that the parents had no extended family in the Knoxville area. *Id.* at 110-11. Finally, we noted that "[t]here [wa]s nothing in the record to suggest that [the mother's] conduct [wa]s vindictive or that she [wa]s in any way deliberately attempting to interfere with his normal and close relationship with his children." *Id.* at 112.

We concluded in *Rogero v. Pitt* that "it would be unduly harsh and punitive to the wife to prevent her from remarrying and taking her children with her to what appears to be an entirely fit and suitable home in Dayton, Ohio ..." We held that the children's father would "simply have to accommodate his visitation schedule to the fact that his former wife plans to remarry and to live in another state." *Id.*

It seems clear that our analysis of the facts in *Rogero v. Pitt*, culminating in our conclusion that removal was justified, should have been taken by the trial court in this case as controlling on the issue of removal. The fact that it was not may be attributable to our observation in *Rogero v. Pitt* concerning the analytical process that should be followed in removal determinations, as follows:

> There are few legal formulae or invariable principles to guide the courts in decisions of this nature. Such decisions are primarily factual, not legal. Attempts to reduce to legal doctrine the resolution of cases such as this usually have little significance. The best interests of the children under all of the circumstances, which, of course, include their relationships with their parents, must be the concern of the courts.

*Id.* at 112.

We repeated this observation in *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990), the last of the trilogy of recent removal cases.[7] The petitioner in *Nichols* was not the custodial parent, who wished

---

5. Of course, the issue in dispute in *Rogero* was not fitness for custody, which had already been determined at the time of the divorce.

6. It is not entirely clear what the provision means, given the ambiguity of its language:

> It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption in favor of or against the award of custody to such party; provided, however, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

The legislative history of the provision in subsection (d) indicates that it was intended to codify case law's "tender years doctrine."

7. *Nichols* involved a petition for modification of custody filed by the non-custodial parent, the father, after the mother left their two sons, aged four and six years old, with the father temporarily, while she went to Arizona to take a new position with the Veterans' Administration. She had asked him to send the children to her by plane six weeks later when she was settled. Instead, he filed for change of custody, which was granted by the trial court and affirmed by the Court of Appeals.

to move the children out of state, but the non-custodial parent, who filed for change of custody in a successful attempt to block removal. We engaged in a lengthy analysis of the burden of proof and the burden of producing evidence, but, once again, we did not announce what standards should guide trial courts in determining whether removal is in a child's best interest.

We think the time has come to undertake that exercise, because if there are, as we supposed in *Rogero* and *Nichols*, but "few legal formulae or invariable principles" relevant to adjudicating removal disputes, the bench and bar are nevertheless entitled to know what those few legal principles are. For, although there was little or no litigation in this area of domestic relations prior to our opinion in *Seessel*, the trial and intermediate courts have experienced a significant increase in the number of removal cases filed since *Seessel* was announced.[8] By undertaking to identify standards for deciding whether or not removal should be allowed, we hope to make determinate an area of the law that has become increasingly unsettled; to establish thereby the degree of predictability necessary to permit lawyers to advise clients with some degree of confidence in the handling of their family affairs; and to stem the flow of litigation over removal that has recently occurred in the courts of Tennessee.

### IV. *Determining the Best Interests of the Child*

At least since the *Kenner* decision in 1918, Tennessee courts have been charged with the responsibility of making custody decisions based on the "welfare and happiness" of the children involved. This early standard is echoed in T.C.A. § 36–6–101, which requires the courts to determine custody "as the welfare and interest of the child or children may demand." Although the statute does not use the term "best interest," the courts of Tennessee have universally applied it in resolving child custody disputes. These decisions require an exercise of discretion by the court to determine what domestic arrangements will be in the best interest of the child or children whose custody is in issue.

The goal of facilitating the child's best interest is certainly a noble one, but the notion that courts can ever know with any certainty what will truly be in a given child's best future interest is perhaps unrealistic. Obviously daunted by the prospect of making such a difficult decision, Tennessee courts have noted that there are "literally thousands" of factors to be considered in deciding custody, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and that these factors "are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next." *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950).

Nearly half a century after *Smith* and *Holloway*, however, it becomes apparent that the absence of standards for its determination threatens to render the concept of "best interest" so vague that it defies analysis, invites decision by guesswork, and evades any sort of meaningful review on appeal. As one commentator has noted, the best interest standard, without more, "risks unwise results, stimulates litigation, permits manipulation and abuse, and allows a level of judicial discretion that is difficult to reconcile with an historic commitment to the rule of law."[9]

---

8. Compilations of unreported Court of Appeals decisions such as the Tennessee Attorneys Memo and the Tennessee Family Law Letter reveal only a very small number of appeals in this area prior to the *Seessel* decision in 1988. Most of them are summarized in Dickerson and Stalnaker, *Best Interest on the Move: Standards for Custodial Removal of Children from Tennessee*, 18 Mem.St.U.L.Rev. 399 (1988). Since *Seessel* was decided, there has been a noticeable increase in such litigation.

9. Crippen, *Stumbling Beyond Best Interests of the Child: Reexamining Child Custody Standard–Setting in the Wake of Minnesota's Four Year Experiment with the Primary Caretaker Preference*, 75 Minn.L.Rev. 427, 499–50 (1990). Indeed, in a journal article published almost simultaneously with the release of this Court's opinion in *Seessel*, the authors reviewed the removal cases decided in Tennessee prior to 1988, focusing on an unreported 1985 decision of the Court of Appeals involving the custodial parent's ultimately successful effort to remove a

Similarly, in an Oregon case in which the custodial parent sought permission to move out of state, the court noted that under well-developed Oregon case law, a request to remove a minor child "is addressed to the court's discretion" and observed:

> The principles by which that discretion is to be applied, however, have not been defined other than by formulary invocation of the phrase "best interests of the child." That rubric is not helpful, however, because any chancellor could justify any result under it. *The judicial task of this case is to give legal form and substance to the chancellor's discretion.*

. . . . .

*In re Marriage of Meier and Meier,* 36 Or.App. 685, 585 P.2d 713, 716 (1978), *rev'd on other grounds,* 286 Or. 437, 595 P.2d 474 (1979) (emphasis added).

■ We face a similar task in this case. As we suggested in *Rogero* and reaffirmed in *Nichols,* there can be no hard and fast rules that apply in deciding custody issues. There are, however, policies that can be developed and principles that can be articulated toward the goal of promoting coherence, consistency, and predictability in our case law, as well as just results in the custody cases decided in courts throughout the state.

The task is assuredly a delicate one. Some jurisdictions have established tests in removal cases that have been criticized as being skewed in one direction or the other. In New York, for example, the custodial parent is required to meet an "exceptional circumstances" standard, one which often prevents removal. *See, e.g., Courten v. Courten,* 92 A.D.2d 579, 459 N.Y.S.2d 464, 466 (App.Div.1983); *but see Hemphill v. Hemphill,* 169 A.D.2d 29, 572 N.Y.S.2d 689 (2d Dept.1991) (custodial parent's remarriage held to be sufficient reason for removal of child to London, England).

At the other extreme, West Virginia has established what is described as a "rule of preference" favoring the award and continuation of custody in the primary caretaker, which, in the post-divorce setting, will almost always be the custodial parent. *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357, 363 (1981). This "bright line rule," heralded by the West Virginia high court for its ease of application, *id.* 278 S.E.2d at 363, has been criticized as failing to give fair consideration to fathers, who less frequently than mothers are primary caretakers.[10]

Most American jurisdictions eschew such "bright line" tests, opting instead for flexi-

---

seven-year-old child from Memphis to Toronto, Canada. That opinion, they wrote:

> ... demonstrates that Tennessee courts have failed to develop an adequate methodology for analyzing best interest cases. First, the courts have not defined the result they are hoping to achieve. It is not clear whether "best interest of the child" means a happy childhood or whether it means a childhood that leads to a well-developed adult regardless of the happiness experienced during youth. The definition adopted will influence which factors should be stressed in a court's best interest analysis....
> Second, the decision is unstructured. The best interest factors are not divided into coherent categories, but are presented randomly throughout the opinion. Thus, the decision is little more than an outline of the evidence as presented by the litigants....
> Third, the court failed to articulate clearly the reasons underlying its decision. It regurgitated the litany of factors presented by the parties and then summarily announced its decision. With the information provided in the opinion, it is impossible to determine exactly

> *why* the court believed that the move was not detrimental to the child's best interest....
> Fourth, in neglecting to divulge openly the factors ultimately relied upon in determining best interest, the court easily could have concealed some bias or predisposition that affected the analysis. Close examination of the opinion reveals that the judges' "gut reaction" may have been just as responsible for the outcome of the case as a thorough, but unwritten, legal analysis....
> Fifth, the vagueness of the best interest standard, especially in the removal context, encourages litigation of the custody decision.

Dickerson and Stalnaker, *Best Interest on the Move: Standards for Custodial Removal of Children from Tennessee,* 18 Mem.St.U.L.Rev. 399, 420–21 (1988). The same criticism undoubtedly pertains in many of Tennessee's recent removal decisions.

**10.** Crippen, *Stumbling Beyond Best Interests of the Child: Reexamining Child Custody Standard–Setting in the Wake of Minnesota's Four Year Experiment with the Primary Caretaker Preference,* 75 Minn.L.Rev. 427 (1990).

ble standards that will provide guidance for trial courts in determining matters of custody and removal, even if they will not convert judges into oracles. It is clear, after all, that the child's true best interest is no divorce in the first place, obviating the possibility of a geographical break-up of the family, as well as the legal break-up entailed by the divorce. As one court has noted:

> We recognize that in most cases it is difficult to establish, in the abstract, what is in the best interests of the children other than to say that they would probably be better off if their parents had been able to get along and had kept the whole family intact. Given the facts that their parents have dissolved their marriage and that each has remarried and that each, with a new spouse, has plans for their respective lives, the question becomes: which of the multiple choices available is best for the children? In many cases, the happiness and well-being of the custodial parent becomes an ingredient of the welfare of the children.

*In re Marriage of Ditto and Ditto,* 52 Or.App. 609, 613, 628 P.2d 777, 779 (1981).

In order to make the removal decision manageable, many jurisdictions have recognized that the "best interest" determination in this context is not equal in scope to the original placement decision or a subsequent decision to modify custody. In an early Georgia case, for example, the court held that "[t]he fact that the defendant [the custodial parent] has remarried, and intends to remove the children to another state with her present husband, does not constitute or amount to such a change of condition as would authorize modification of the decree [giving the defendant custody]." *Mercer v. Foster,* 210 Ga. 546, 81 S.E.2d 458, 460 (1954). In *Auge v. Auge,* 334 N.W.2d 393, 399 (Minn.1983), the Minnesota Supreme Court recognized a "presumption favoring removal [a]s the better approach[ ] for several reasons.... [including the fact that] in most cases it would obviate *de novo* consideration of who is best suited to have custody, an issue which has already been resolved once by the courts." *See also Cheatham v. Cheat-*

*ham,* 344 So.2d 525, 527 (Ala.Civ.App.1977) (removal, by itself, held not to constitute a change of circumstance sufficient to modify custody decree).

These cases, and others like them, reflect the collective wisdom of both the courts and child psychologists that children, especially those subjected to the trauma of a divorce, need stability and continuity in relationships most of all. This recognition has led to a strong presumption in favor of continuity of placement, which is reflected in the well-established rule that courts will not entertain petitions for change of custody unless there has been some change in circumstances that has rendered the custodial parent unfit or has exposed the child to some form of risk. In the view of the overwhelming number of American courts, the custodial parent's relocation, all other factors being equal, is not such a "change in circumstance," because it does not inherently affect the fitness of the custodial parent. Thus, the Maryland Court of Special Appeals, in permitting the removal of a child out of the country, noted:

> At no point in the course of these long and drawn out proceedings has the appellant suggested that the mother is not a proper person to have the care and custody of Garrett. Appellant urges that the suggested removal of Garrett to South Africa is in and of itself a sufficient change in circumstances to justify a change in custody. We do not agree.... The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child.... The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change, is in their best interests....

*Jordan v. Jordan,* 50 Md.App. 437, 442–3, 439 A.2d 26, 29 (1982) (citations omitted).

Hence, most courts faced with the issue of removal have held that relocating as a

result of marriage, employment, and the like does not render a parent to whom custody has been granted "unfit," thereby constituting the basis for a change of custody. *Id.*, 439 A.2d at 31. *Accord In re Marriage of Burgham*, 86 Ill.App.3d 341, 345, 41 Ill.Dec. 691, 694, 408 N.E.2d 37, 40 (Ill.App.1980) ("it is generally in a child's best interest to remain with the parent in whose custody the court has determined to place it," unless there is "a specific showing that the move would be against the child's best interest").

In refusing to review the original custody decision *de novo* in the face of a removal petition, some courts have gone so far as to recast the best-interest inquiry, steering away from the child's best interest and focusing instead on the best interest of the new family unit, whether that unit is composed of the custodial parent and minor child or of the custodial parent, his or her new spouse, and the child. *See, e.g., D'Onofrio v. D'Onofrio*, 144 N.J.Super. 200, 206, 365 A.2d 27, 29–30, *aff'd*, 144 N.J.Super. 352, 365 A.2d 716 (1976); *Henry v. Henry*, 119 Mich.App. 319, 326 N.W.2d 497, 499 (1982) (adopting *D'Onofrio*: the proper test "focuses on what is in the best interest of the new family unit, i.e., custodial parent and child, and not what is in the best interest of the child; the latter having been decided in the earlier custody hearings").

In almost every removal case, moreover, the courts have recognized that the child's best interests are fundamentally interrelated with those of the custodial parent. In *Hale v. Hale*, for example, the trial court had "prohibited removal on the basis that the move would make visitation more difficult." 12 Mass.App.Ct. 812, 429 N.E.2d 340, 342 (1981). The reviewing court reversed, holding that "[t]he best interests of children for purposes of deciding whether to permit removal are ... interwoven with the well being of the custodial parent, and the determination, therefore, requires that the interests of the [custodial parent] also be taken into account." *Id.*

Similarly, the court in *Arquilla v. Arquilla* reviewed a trial court's order prohibiting the removal of a minor child based on the trial court's conclusion that the child's best interests were "served by remaining in proximity to his father." 85 Ill.App.3d 1090, 1093, 41 Ill.Dec. 450, 452, 407 N.E.2d 948, 950 (Ill.App.1980). The reviewing court held:

> We reverse because the test ... is not singly to establish what is in the best interest of the child. Rather, the question is also whether the general quality of life for both *the custodial parent and the child* will be improved by the removal. It would be incongruous for a court, when presented with a custodial order originally based upon the best interests of the child, to refuse to support the efforts of the custodial parent to maintain and enhance *their* standard of living, albeit in another jurisdiction. So long as the court is satisfied with the motives of the custodial parent in seeking the move and reasonable visitation is available to the remaining parent, removal should be granted.

*Id.* (emphasis in original). *Accord In re Marriage of Burgham, supra*, 41 Ill.Dec. at 694, 408 N.E.2d at 40 ("[G]ranting ... a request [to remove] would likely indirectly benefit the child by making the custodian a happier, better adjusted parent than would be the case if the custodian's freedom of movement was more restrained."); *Long v. Long*, 127 Wis.2d 521, 381 N.W.2d 350, 355 (1986) (In deciding whether to permit removal, courts may not "ignore[ ] the impact of the custodial mother's well-being on the children and refuse[ ] to consider alternative visitation arrangements."); *In re Marriage of Lower*, 269 N.W.2d 822, 826 (Iowa 1978) ("While there is much to be said for the maintenance of visitation rights by the non-custodial parent ... the interests of the custodial parent and the child may be overriding."); *Cooper v. Cooper*, 99 N.J. 42, 54, 491 A.2d 606, 612 (1984) ("Because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account.")

Another factor that has been widely recognized as relevant was explicated in the

case of *Pattison v. Pattison*, 208 So.2d 395, 396 (La.App.1968), in which the court was asked to hold in contempt a custodial parent who had remarried and moved to New York with the minor children of the two parties, as follows:

> In our highly mobile society, it is usually unrealistic to demand that a parent granted custody of the children be confined in a certain geographical area during their minority. We take judicial cognizance of the fact that men and women are readily subject to job transfer in our society and equity demands that they should be free to go where their best opportunities lie and[,] pertinent to this case, that a woman who remarries should be free to go to the home which her new husband provides for her.

The *Pattison* court refused to force the mother to return to Louisiana, noting that "the plaintiff [non-custodial parent] admits that he has not been denied visitation rights although their exercise has become more onerous." *Id.* at 397. *Accord In re Marriage of Lower, supra,* 269 N.W.2d at 826 (quoting *Pattison*); *Henry v. Henry, supra,* 326 N.W.2d at 498–499 (out of state custody disputes now subject to Uniform Child Custody Act, thereby obviating central reason for denying removal in the past).

Likewise, the Supreme Court of New Jersey, in a recent opinion, has noted:

> In every divorce, the family unit is broken, and the relationship between the parties irrevocably changed. ... Formerly, custody of children of tender years was generally awarded to the mother. With increasing frequency, however, mothers and fathers now share the responsibility for the care and custody of their children and the support of the family. Consequently, courts have begun to make more frequent awards of custody to fathers and, in appropriate cases, to make joint custody awards. Nonetheless, in many instances, the mother still receives custody of the children and the father is awarded visitation rights. Implicit in that arrangement is the right of the father to move elsewhere for virtually any reason. As men and women approach parity, the question arises when a custodial mother wants to move from one state to another, why not? ... Short of an adverse effect on the non-custody parent's visitation rights or other aspects of a child's best interest, the custodial parent should enjoy the same freedom of movement as the non-custodial parent.

*Holder v. Polanski,* 111 N.J. 344, 349, 352, 544 A.2d 852, 854–55, 856 (1988) (citations omitted). *Accord Jordan,* 50 Md.App. at 449, 439 A.2d at 32 (noncustodial parents have right to visitation but "[c]ustodial parents have rights as well", including the right to remarry and relocate).

The right of the custodial parent to move to another jurisdiction does, of course, require adjustments to existing visitation schedules. If the parents cannot agree to a new schedule, the court may be called upon to intervene. And, as one appellate court noted:

> We are not insensitive to the situation of the non-custodial parent who genuinely desires a relationship with his child. Nor is there any question of the importance to the child of having a firm and healthy relationship with the non-custodial parent. Nevertheless, it is obvious that for the child the fact of the divorce becomes the predicate of his subsequent relationship with both parents and that relationship can never be the same as it would have been had the marriage remained intact. Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go his or her own way. Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context.

*Helentjaris v. Sudano,* 194 N.J.Super. 220, 230, 476 A.2d 828, 833 (App.Div.1984). The appellate court in *Helentjaris* permitted removal of the parties' minor child from New Jersey to Ohio, where the custodial parent wished to move to be near her family and to take a new job. The court noted that one option was for the non-custodial parent to relocate to Ohio also:

If either is to sacrifice in this respect, there is indeed less reason to demand the sacrifice to be made by the custodial parent since it is she in the end who must arrange her life in a manner consistent with the day-to-day burdens of simultaneously raising a child and pursuing a career.

*Id.* at 229–30, 476 A.2d at 832.

Obviously, visitation is a prime consideration in custody decisions, but, in the words of one state supreme court:

Visitation is a flexible arrangement that the parents and the court can modify as circumstances require without undermining the relationship of the child and the noncustodial parent.... Visitation arrangements depend on circumstances, such as the proximity of the child's residence to that of the noncustodial parent and the needs of the child. In short, visitation arrangements reflect a variety of approaches to encouraging a relationship between the child and the noncustodial parent—they do not reflect the existence of a noncustodial parent's inviolate right to any particular arrangement.

*Long,* 381 N.W.2d at 356. Thus, said the *Long* court, the noncustodial parent cannot use the right of visitation "to burden unduly the custodial parent or to impede his or her decision-making authority as the primary caretaker." *Id.* The court permitted the custodial parent to remove the parties' two minor children from the state, with this observation:

We are sensitive to the need for these children to maintain their relationship with their father, *but retaining the father's weekly visitation should not have been the sole factor on which the circuit court determined the removal to be against the children's best interests....*

It is evident from the record that there are reasonable visitation alternatives—namely, less frequent but more extended visits—which will preserve the children's relationship with their father.

*Id.* at 358 (emphasis added). *See also D'Onofrio,* 144 N.J.Super. at 207–8, 365 A.2d at 30, in which the court said:

It is further clear that a noncustodial parent is perfectly free to remove himself from this jurisdiction despite the continued residency here of his children[,] in order to seek opportunities or a better or different life style for himself. And if he does choose to do so, the custodial parent could hardly hope to restrain him from leaving this State on the ground that his removal will either deprive the children of the paternal relationship or depreciate its quality. The custodial parent, who bears the essential burden and responsibility for the children, is clearly entitled to the same option to seek a better life for herself and the children, particularly where the exercise of that option appears to be truly advantageous to their interests and provided that the paternal interest can continue to be accommodated, even if by a different visitation arrangement than heretofore.

Indeed, said the *D'Onofrio* court:

It is at least arguable, and the literature does not suggest otherwise, that the alternative of uninterrupted visits of a week or more in duration several times a year, where the father is in constant and exclusive parental contact with the children and has to plan and provide for them on a daily basis, may well serve the paternal relationship better than the typical weekly visit which involves little if any exercise of real paternal responsibility.

*Id.* at 207, 365 A.2d at 30. In any event, as the Oregon Court of Appeals noted in *Meier,* 36 Or.App. at 691, 585 P.2d at 716, although relocation of the children may mean that the father's visitation arrangements have to be rescheduled, "his right cannot be an absolute anchor on the mother."

## V. *Procedure on Removal Petition*

Much of what we held in the *Seessel–Rogero–Nichols* trilogy remains good law in Tennessee. But realizing the twin goals of (1) limiting judicial intervention in post-divorce family decision-making, and (2) making disputes easier of resolution if they must be litigated, requires further explication from this Court.

The factors to be considered in a removal dispute are discussed in the prior section. They include (but are not limited to) a recognition that in removal cases, the question of custody is not subject to *de novo* review, unless the petition cites reasons other than removal as grounds for change of custody; that there is a strong presumption in favor of continuity of the original custody award; that the welfare of the child is affected by the welfare of the custodial parent, and that the best interest of the child must be reviewed in order to determine the advantages of the move to the child; that removal of the child from the jurisdiction may require rescheduling of the non-custodial parent's visitation, but that removal is not, in and of itself, a change of circumstance sufficient to justify modification of the custody order; that the courts must be sensitive to the non-custodial parent's efforts to maintain his or her relationship with the children, and that visitation should be arranged in a manner most likely to enhance that relationship; and, finally, that the motives of the custodial parent in making the move must appear to be valid, that is, not intended to defeat or deter visitation by the non-custodial parent. These factors, and any related factual circumstances found by the court to be significant in a given situation, must be weighed individually and collectively.

If there is no outstanding order restricting movement of the child or children, and the parties can agree to a revised visitation schedule, the custodial parent is free to remove without seeking further court authorization. Likewise, if the non-custodial parent consents to the removal and the parties can agree on a revised visitation arrangement, a prior order of restriction may be modified by agreement on motion to the court having jurisdiction of that order and subject to the approval of that court.

If agreement between the parties cannot be reached, under the procedural rule announced in *Seessel* and *Nichols*, the burden of proof falls on the party who files a petition seeking relief.[11] In order to discharge that burden, the non-custodial parent who seeks to prevent removal must show by a preponderance of the evidence that removal is adverse to the best interest of the child or children involved. If, on the other hand, the custodial parent files for relief, seeking to lift a prior prohibition on removal or asking the court's permission to move from the jurisdiction, or both, the custodial parent has the burden of proving that removal is in the child's best interest. That burden can be shifted by a prima facie showing of a sincere, good-faith reason for the move and a prima facie showing that the move is consistent with the child's best interest.

## VI.  *Conclusion*

Applying the substantive principles and procedural rules set out above to the facts of the case before us, we come to the ineluctable conclusion that the judgments of the trial court and the Court of Appeals must be reversed. The custodial parent properly petitioned the trial court to suspend its previously imposed restriction on removal and sought permission to move with Brittney to Davenport, Iowa. She has shown that removal is warranted in this case, based on a well-established reason for the move—her remarriage to someone who was living, for an equally good reason, some distance from Memphis. There is no suggestion in the record that Deborah Mitten is anything other than a wholly fit person to have custody of Brittney—indeed, the trial court has now made that finding on three separate occasions. There is no showing that the move will have adverse consequences to Brittney's health

---

11. This is the normal burden placed on a party using the judicial process to advance a proposition. *See, e.g., Long*, 381 N.W.2d at 353–4 n. 4. There are, however, jurisdictions in which the burden of proof in removal cases falls on the non-custodial parent, regardless of who files initially, to show that the move is not in the child's best interest, or that the custodial par-

ent's decision to move was not made in good faith. *See, e.g., Lower*, 269 N.W.2d at 826; *Cheatham*, 344 So.2d at 527. In Wisconsin, the burden of proof is assigned by statute to the objecting party to show that removal is "against the best interest of the child." *See* Sec. 767.-245(6), Stats. 1983–84, and *Long*, 381 N.W.2d at 353–54.

or well-being. In fact, the record reflects that the Mittens have gone out of their way to make the move from Memphis to Davenport a smooth one for Brittney, attempting in every way to reduce the impact of the transition on her and looking at all times to her welfare.

It is obvious that the previously established schedule of visitation will have to be altered. There is no proof that this cannot be successfully accomplished to accommodate the interests of both parents, as well as the child's interest. There is nothing in the record to indicate that Deborah Mitten's conduct has been vindictive or that in proposing to move to Davenport, she intended to deprive Steve Taylor of his visitation rights or to interfere with his close relationship with his child.

We submit this opinion in the hope that it will provide guidance to the courts that must make difficult, Solomon-like decisions in cases like the one before us, and to the lawyers who practice before them. As we have noted, judges are not oracles, whether they labor in the trial courts of Tennessee or sift through transcripts and treatises in the relative obscurity of appellate chambers. In dealing with family relationships—those irretrievably broken and those in the process of regeneration—courts must strive to facilitate recovery.

We have no doubt that the trial judge in this case subscribes fully to these sentiments, and that the "solution" he devised was well-intended. But it was demonstrably not in Brittney Taylor's best interest. It presented her mother with a veritable Hobson's choice—give up custody of the child in order to join her new husband and raise their child in a stable family relationship, or live in Memphis with only the two children and prolong the instability caused originally by the divorce.

It is essential that the courts deal pragmatically with circumstances such as those presented in this case. We all recognize that "[i]n a perfect world, every child would live in a loving, two-parent home. Unfortunately, we do not live in such a world. When parents are divorced or separated, the family unit, even from the per-

spective of the child, is broken. The parents no longer live in harmony but have competing and often irreconcilable interests." *Cooper*, 491 A.2d at 612–13.

Furthermore, "[i]n considering the parental relationship between the child and the non-custodial parent, it must be recognized that after a divorce the child of the marriage becomes a member of two separate families, the mother's and the father's. The family unity which is lost as a consequence is lost irrevocably, and there is no point in judicial insistence on maintaining a wholly unrealistic simulation of unity." *Helentjaris v. Sudano*, 476 A.2d at 828.

In this case, the trial court attempted to construct just such a "simulation of unity," but the effect was to deprive Brittney of the opportunity to "live in a loving, two-parent home" set up for her benefit by her mother and stepfather in Davenport, Iowa. As we observed in *Rogero v. Pitt*, 759 S.W.2d at 112, "it would be unduly harsh and punitive to the [custodial parent] to prevent her from remarrying and taking her child[ ] with her to what appears to be an entirely fit and suitable home [out of state]."

Brittney and her mother must be allowed to leave Memphis and join Mark Mitten in Davenport, or elsewhere, subject to the establishment of a reasonable visitation schedule that will enable Brittney to maintain her relationship with her father.

The case is remanded to the trial court for entry of an appropriate order.

Reversed and remanded.

REID, C.J., and DROWOTA and ANDERSON, JJ., concur.

O'BRIEN, J., dissents.

O'BRIEN, Justice, dissenting.

The lead opinion, evidences an intensive and extraordinary degree of research, largely in other jurisdictions, in order to fashion a rule which appears to be solely for the purpose of meeting the exigencies of this case.

**334**

While conceding that what is referred to as the *Seessel–Rogero–Nichols* trilogy [1] remains good law and citing the procedural rule announced in *Seessel* and *Nichols,* and followed in *Rogero,* the opinion ignores the evidence considered in the trial court to state "the ineluctable conclusion that the judgements of the trial court and the Court of Appeals must be reversed" and that plaintiff has "discharged her burden of proof" by showing a universally accepted reason for the move—her remarriage to someone who was living for an equally good reason, some distance from Memphis.

It is obvious a great deal more evidence was considered by the trial judge than Ms. Taylor's [Mitten] desire to remove herself to Iowa where her new husband was in school.

*Seessel* and *Rogero* both involved joint custody, while in this case custody was fixed by agreement between the parties. *Nichols* was virtually a case of joint custody. It is incontrovertible that every case is factually different. It is the function of the trial judge and not the appellate courts to consider the facts in every case and base a ruling on those facts.

The majority recognized the analytical process to be followed which is stated in *Rogero v. Pitt,* and bears repeating:

> There are few legal formulae or invariable principles to guide the court in decisions of this nature. Such decisions are primarily factual, not legal. Attempts to reduce to legal doctrine the resolution of cases such as this usually have little significance. The best interests of the children under all the circumstances, which, of course, include their relationships with their parents, must be the concern of the courts.

Despite this recognition of a clear, and valid law and principles to be followed, the lead opinion continues with an exercise in tedium to assume the function of a trial court in which it emasculates the trial judge and abrogates the statutory law on child custody and visitation.

I dissent.

1. *Seessel v. Seessel,* 748 S.W.2d 422 (Tenn.1988); *Rogero v. Pitt,* 759 S.W.2d 109 (Tenn.1988); and *Nichols v. Nichols,* 792 S.W.2d 713 (Tenn.1990).