IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 2, 2001 Session

## MELISSA JANE (NICHOLS) STEEN v. EVANS HARRINGTON STEEN

**Appeal from the General Sessions Court for Wilson County**
**No. 4099     Robert P. Hamilton, Judge**

---

**No. M2000-00313-COA-R3-CV - Filed May 23, 2001**

---

In this custody case the General Sessions Court of Wilson County changed its custody order from joint care and control with primary custody in the father to exclusive custody in the father and standard visitation to the mother.  The record shows, however, that the mother has had primary custody of the children since the divorce and that both parties are fit parents.  They each love the children and take good care of them.  Under those circumstances, we hold that there is a presumption in favor of continuity of placement.  Therefore, we reverse the lower court's order and grant primary custody to the mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court**
**Reversed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Michael W. Binkley, Nashville, Tennessee, for the appellant, Melissa Jane (Nichols) Steen.

Mary Arline Evans and John Michael Garrett, Nashville, Tennessee, for the appellee, Evans Harrington Steen.

### OPINION

### I.

Melissa Jane Nichols and Evans Harrington Steen were married October 10, 1987.  They had two children Chelsea, born April 28, 1990, and Caleb, born September 19, 1991.  They subsequently separated December 1, 1993.  The trial court entered a decree of divorce and a Marital Dissolution Agreement (the "MDA") on June 21, 1994.

The MDA covered all aspects of custody of the children.  Primary custody of the children was given to the father, but the mother was to have custody of the children every other week.  The

judge termed this arrangement joint custody and, therefore, he did not order any child support payments. The mother and father were to equally divide the insurance premiums. Under the MDA, the parents alternated custody for the major holidays, Thanksgiving, Christmas and Easter. Each holiday was divided in half with each parent getting custody of the children for half of the holiday period. The parents also alternated custody on Memorial Day, Labor Day and the Fourth of July.

The parties, however, did not observe the custody provisions of the MDA. The father apparently believed that the children needed their mother and that he could not take the full responsibility. Therefore, the mother became the primary custodian for the next four and a half to five years. Sometimes the father would take the children from Friday afternoon through Tuesday morning, but the record is not clear how often he followed this routine. The mother testified that in five years, the father had taken a total of three weeks of vacation with the children. The father testified that immediately after the divorce, he could tell that the week-to-week custody was not going to work, so he took the children from Friday to Tuesday morning.

On September 17, 1998, the mother filed a Petition for Contempt and to Change Custody. The petition alleged that the father did not pay his half of the insurance premium and was $3,550.00 behind. The petition also alleged that the father had not exercised joint custody besides a week when the mother was on a business trip. She also alleged that the father moved to Florida after providing only two (2) weeks notice to her and only contacted the children once during a three (3) month period. The petition also alleged that upon his return to Nashville, the father had not regularly exercised visitation. The mother then requested (1) that the trial court order the father to pay all medical insurance payments owed; (2) that the court award full care, custody and control of the children to her with the father having reasonable visitation; and (3) that the court order the father to pay child support.

The father filed an answer in reply to the mother's petition, in which he asked for the dismissal of the mother's petition. In his answer, the father stated that he had not paid the insurance premiums because the mother never provided him with any documentation as to the amount of the premiums. He also disputed the mother's contention as to the exercise of custody. As to the allegations surrounding his move to Florida, the father replied that he was not in Florida for three (3) months. Rather, he moved there May 21, 1998 and returned July 26, 1998. The father asserted that he did speak with the mother about his move and they came to a verbal agreement to change the custody arrangements. However, the mother refused to abide by this agreement after the father moved to Florida. He stated that he returned to Nashville to visit with the children on two (2) occasions. He also denied that he had not resumed regular visitation upon his return to Nashville.

The proof showed that the parties never operated under the custody provisions of the MDA. From the beginning Ms. Steen has been the primary custodian of the children and Mr. Steen has exercised visitation on an irregular basis. The proof is not clear just how irregular his visits with the children had been, but Mr. Steen admits that initially he thought it was best that the children not be "ripped" away from their mother and that his role was to "fill in" where he was needed. The record shows that this arrangement worked well; there was no proof that the children suffered any adverse

consequences from their parents' decision to ignore the original custody decree. The circumstances changed when Mr. Steen moved to Florida and was unable to perform his gap-filling role.

Mr. Steen moved to Florida in May of 1988 to train for a new job. He anticipated that the training would last from twelve to fourteen months, but after two months he gave up the job and returned to Nashville. The precipitating event was a telephone call from Ms. Steen telling Mr. Steen that she had to go out of town and that she needed him to suggest someone with whom she could leave the children. Mr. Steen arranged for his future wife, who was still in Nashville, to keep the children while Ms. Steen was out of town.

Mr. Steen remarried upon his return from Florida. His new wife is a speech pathologist who works on a flexible schedule, putting in from six to twenty-five hours a week. Mr. Steen works in sales and also has a flexible schedule. He and his new wife live in a three bedroom house with the wife's five-year-old daughter. Mr. Steen fathered another child shortly after his divorce from Ms. Steen and that child stays with him every other weekend and one night each week. When Chelsea and Caleb visit in Mr. Steen's home the four children share the two spare bedrooms.

Ms. Steen is a contract analyst for Columbia HCA in Nashville where she earns $50,000 per year. In 1995 she entered a guilty plea to a charge of theft from her employer, a Class C felony. She received a four year suspended sentence and was placed under supervised probation for five years. Since the divorce Ms. Steen had lived in five different places, including a period of time with her mother. Ms. Steen now lives in Williamson County where she has enrolled the children in school. They are doing very well there. She and her fiancé are building a home, and they plan to get married, but as of the date of trial, they had not finalized their plans.

## II.
### CHANGE OF CIRCUMSTANCES

Child custody judgments are res judicata upon the facts existing at the time of the hearing. *Hicks v. Hicks*, 176 S.W.2d 371 (Tenn. Ct. App. 1943). But the trial court retains control over the custody of a minor child and may make such changes in the custody order as the exigencies of the case may require. *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997). The party seeking to change custody must prove (1) that the child's circumstances have materially changed in a way that could not have been reasonably foreseen at the time of the original custody decision, and (2) that the child's best interests will be served by changing the existing custody arrangement. *Id.* at 485.

An argument could be made that there have been no changes in the circumstances that were foreseen at the time of the original divorce. But that is an argument for leaving the original decree in place when it has never governed the custody of these children. Both parties sought a modification of the original decree and we agree that it should be changed to reflect what is actually occurring.

# III.
## THE BEST INTERESTS OF THE CHILDREN

Once into the arena of the best interests of the children we face one of the most important decisions that any court has to make. *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997); *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). As Judge Conner said in *Bah v. Bah*, the best interests of the children "is the polestar, the alpha and omega." 668 S.W.2d at 665. To assist the courts in making that decision the legislature has decreed that all relevant factors should be considered, including the following when applicable:

(1)  The love, affection and emotional ties existing between the parents and child;

(2)  The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4)  The stability of the family unit of the parents;

(5)  The mental and physical health of the parents;

(6)  The home, school and community record of the child;

(7)  The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8)  Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred, the court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9)	The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a).

In this case the trial judge found that both parties were good parents. There were no findings that either parent did anything that adversely affected the children. The children were doing well and neither expressed a preference for where they wished to live. The balance-tipping factor seemed to be Mr. Steen's remarriage and the stability that his new wife added to his home. Ms. Steen had plans to marry in the future, and the court expressed a question about why she and her fiancé were waiting.

Mr. Steen argues that he felt Ms. Steen put her interests above that of the children. He said she threatened to put the children in "overnight day care" if he did not fill in when needed. Ms. Steen denied making that threat and no one seems to be aware that there were such facilities available. Mr. Steen also argues about some other minor considerations, but the fact remains that he was perfectly content for nearly five years for Ms. Steen to have primary custody of the children. He was willing to move to Florida for twelve to fourteen months and leave them in her custody. We think that fact shows that in his estimation she was a good mother to the children. When the consideration of all other factors results in an even balance, the presumption in favor of continuity of placement requires us to refuse a change of custody. *Placencia v. Placencia*, 3 S.W.3d 497 (Tenn. Ct. App. 1999). In *Taylor v. Taylor*, 849 S.W.2d 319 (Tenn. 1993), the court said this presumption is so strong that courts should not entertain petitions for a change of custody unless there is some change in circumstances that has rendered the custodial parent unfit or has exposed the child to some form of risk. *Id.* at 328.

Ms. Steen has functioned as the de facto custodial parent since the divorce. For the four and one-half year period until the hearing in 1998 she had provided for the children and they had done very well. Although she had moved frequently, by the time of the hearing she had settled in Williamson County where the children attended an excellent school. She would soon move into a new home only a short distance from the school.

It is true that appellate courts are reluctant to second-guess trial judges in custody cases where so much depends on the trial judge's assessment of the witnesses' credibility. *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997). But in this case we think the evidence preponderates against the finding that the best interests of the children would be served by changing primary custody from the mother to the father. *Id.*; *see also Placencia v. Placencia*, 3 S.W.3d 497 (Tenn. Ct. App. 1999). We, therefore, reverse the trial court's custody award and remand the cause

to the trial court to set an appropriate amount of child support for Mr. Steen to pay and to set an appropriate visitation schedule.

The lower court's judgment is reversed and the cause is remanded to the General Sessions Court of Wilson County. Tax the costs on appeal to the appellee, Evans Harrington Steen.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.