COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE


CHRIS SENSING,                        )
                                      )
        Plaintiff/Appellant,          )
                                      )       Appeal No.
                                      )       01-A-01-9701-JP-00042
VS.                                   )
                                      )       Humphreys Juvenile/Probate
                                      )       No. J-3454-95
KARRIE DODSON,                        )
                                      )
        Defendant/Appellee.           )


        APPEAL FROM THE JUVENILE AND PROBATE COURT
                OF HUMPHREYS COUNTY
                AT WAVERLY, TENNESSEE

        THE HONORABLE ANTHONY L. SANDERS, JUDGE

FILED

October 29, 1997

Cecil W. Crowson
Appellate Court Clerk

PHILLIP M. GEORGE
P. O. Box 467
511 Enon Springs Road, East
Smyrna, Tennessee 37167
        Attorney for Plaintiff/Appellant

WILLIAM LANDIS TURNER
102 No. Court Street
P. O. box 789
Hohenwald, Tennessee 38462
        Attorney for Defendant/Appellee


                AFFIRMED IN PART; VACATED IN PART;
                        AND REMANDED


                        BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

This case involves a father's right of visitation with his minor child born out of wedlock. Because we find that the trial court could have structured visitation in a manner which interfered less with the parent/child relationship, we remand this case for a re-structuring of the visitation arrangement in accordance with the following opinion.

## I.

### Facts

In 1989, Chris Sensing ("the Father") and Karrie Dodson ("the Mother") entered a relationship which resulted in the birth of Taylor Nicole Dodson ("the Child") on June 24, 1990. Though their relationship was over by the time the Child was born, the parties continued to be in communication throughout the Mother's pregnancy. By his own admission, the Father was minimally involved in the early years of the Child's life. The evidence showed that his visits with the Child were sporadic and his efforts to financially support her were insignificant. The Father accounted for this failure with testimony that he was young and irresponsible at this point in his life.

However, in December of 1994, when the Father married Terri Sensing and became the step father of her two children, his attitude toward the Child greatly changed. He testified that, at this time, he became a devout Christian and an involved member of a Pentecostal church. Terri Sensing testified that the Father is a wonderful father to her two children. They have decided together to keep alcohol and drugs out of their lives. Mrs. Sensing understands what the Mother is going through and that

her husband, the Father, has not always acted responsibly in the past. Mrs. Sensing stated that she has encouraged the Father to establish a relationship with the Child.

The court proceedings in this case began with a hearing on the Father's "Petition to Establish Paternity and to Set Child Support and Visitation" which resulted in an "Order of Paternity" entered March 11, 1996. As well as establishing the Father's paternity, this order set child support and ordered that visitation be "implemented gradually" beginning with two hours every two weeks. On July 30, 1996, the court entered a second order after holding a hearing on the Father's "Motion to Increase Visitation and to Decrease Child Support." In this order, the court decreased child support but increased the visitation to six hours every two weeks with the provision that "[o]n September 13, 1996, the visitation will increase to overnight visitation" from 6:00 p.m. Friday to 6:00 p.m. Saturday. These visitation provisions were allowed to stand in the court's third and final order issued on October 17, 1996.

## II.

### Visitation

On appeal, the Father challenges only the visitation arrangement set by the court below. He asserts first that the trial judge erred after the second and third hearing by not expanding his visitation with the Child to standard visitation. *See* Tenn. Comp. R. & Reg. R. 1240-2-4-.04(1)(b)(a section on child support guidelines, defining "average visitation" as "every other weekend from Friday evening to Sunday evening, two weeks during the summer and two weeks during holiday periods throughout the year"). The Father offers the uncontroverted testimony that the two-hour bi-weekly visitation structured by the court in the first order had been successful and had resulted in the Father and the Child bonding. He testified that he was driving over two hundred miles round trip for the two hours of visitation.

The Mother contends that because the Child was born out of wedlock and because the Father has neglected the Child in the past, the Father has no right to visitation at all. She cites *Lawson v. Scott*, 9 Tenn. 92 (1825), for the proposition that the mother of a child born out of wedlock has superior rights to a legitimizing father. More recently, our supreme court has held as follows:

> The father of a child born out of wedlock has a fundamental interest in the care and custody of the child under both the federal and state constitutions; however, the father must take affirmative steps to develop a responsible relationship with the child before his interest is sufficient to acquire constitutional due process protection; and, if the father has admitted his paternity and has established a substantial relationship with the child, the state may not interfere with that relationship except to protect the child from substantial harm.

*Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995) (citing *Nale v. Robertson*, 871 S.W.2d 674 (Tenn. 1994)). In light of this clear direction from the court, we reject the argument that the Father has no right to visitation simply because he was not married to the Mother. We turn to a review of the lower court's decision keeping in mind that the Father's rights depend upon whether he has "take[n] affirmative steps to develop a responsible relationship with the child." *Id.*

We review the lower court decision de novo with a presumption or correctness. Tenn. R. App. P. 13(d); *Blair v. Badenhope*, 940 S.W.2d 575, 576 (Tenn. App. 1996). In so doing, we note the well established law "that 'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge . . . and that the trial court's decision will not ordinarily be reversed absent some abuse of that discretion.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Jahn v. Jahn*, 932 S.W.2d 939, 941-42 (Tenn. App. 1996). The deference to the trial court rests on the fact that "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the" trial court proceedings. *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. App. 1996).

We find that the record establishes that the Father has taken steps to develop a relationship with the Child thereby entitling him to a constitutionally-protected interest in the Child's care and custody. *See Petrosky*, 898 S.W.2d at 728. We appreciate the Father's candid acknowledgment that he has not always been a reliable parent to the Child as well as his current willingness to accept his parental responsibility. Furthermore, the Father's interest in fatherhood, though delayed, has been consistent for the last few years of the Child's life. Our conclusion does not, however, preempt a determination of the Child's best interests with regard to the type of visitation arrangement now at issue. In child custody and visitation cases, "the desires of the parents are secondary" to the best interests of the children. *Gaskill*, 936 S.W.2d at 630; *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. App. 1987). As our courts have made clear, the welfare of the child is and always has been the court's "paramount consideration." *Suttles*, 748 S.W.2d at 429; *D v. K*, 917 S.W.2d 682, 685 (Tenn. App. 1995).

This court has recognized that because "stability is important to any child's well-being," the "continuity of placement in custody and visitation cases" has been emphasized by the courts. *Gaskill*, 936 S.W.2d at 630 (citing *Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn.1993)). This case involves a father who was not involved in his child's life until that child was four or five years old. At this time, the Child had been raised solely by the Mother and barely knew the Father. In ordering a plan of gradual implementation of visitation, the court below seemed most concerned that the Child be eased into this new relationship.

Moreover, we think it extremely significant that the trial court was increasing visitation. After only four months of two-hour bi-weekly visitation, the court ordered visitation to increase to six hours every two weeks with a plan to increase it to overnight visitation within the next two months. In announcing its decision not to alter visitation after the final hearing, the trial court acknowledged that the Father was

making an effort. The judge stated that he might change visitation in the future, "but it will be after a while." There is no evidence that the court was opposed to standard visitation once the child was ready. In light of these circumstances, we find that the trial court did not abuse its discretion by declining to increase visitation to standard forty-eight hour visitation.

## III.

## Dispute over the Child's Religious Upbringing

Lastly, we turn to the Father's allegation that the trial court showed a preference for the Mother's church affiliation over his own. The proof was that the Father is an active member of a Pentecostal church while the Mother and the Child regularly attend a Baptist church. Our court has spoken clearly on the issue of the purposeful structuring of visitation to prevent children from accompanying their non-custodial parents to church. *Neely v. Neely*, 737 S.W.2d 539 (Tenn. App. 1987). In *Neely*, the court held that "[i]n the absence of a showing of harm to the child, visitation provisions cannot have the effect of advancing one parent's religion while inhibiting that of the other parent." *Id.* at 543.

The lower court in *Neely* had declined to modify a visitation arrangement which required a father to return his child to the child's mother in time for Sunday morning church. In so doing, the court stated that the child "needs stability and needs to know where his church is and where his home is and to be comfortable with that knowledge." *Id.* at 541. The Court of Appeals reversed the lower court's decision noting the fundamental interests that natural parents have in their children. *Id.* at 542 (citing *State ex rel. Bethel v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898)). The court stated that "[c]ourts should attempt, to the extent warranted by the facts, to devise a custody and visitation arrangement that interferes with the parent/child relationship as little as possible." *Neely*, 737 S.W.2d at 542. When parents disagree as to the

religious upbringing of their children, "[c]ourts must maintain strict neutrality. . . . [A] court cannot prefer the religious views of one parent over another unless one parent's religious beliefs and practices threaten the health and well-being of the child." *Id.* at 543. The *Neely* court concluded that there had been no proof that exposing the child to his father's church would affect the child's well-being.

In the case before us, the trial court did order that overnight visitation be from 6:00 p.m. on Friday to 6:00 p.m. on Saturday, thereby precluding regular Sunday visitation. At the second hearing, the Mother testified that she wanted the Child to go to her own church on all Sunday mornings: "I don't think she should be there fifty percent of the time. I mean, her friends are there, you know her family . . . It's her schedule that's being interrupted, and it shouldn't be." Upon being questioned by her attorney as to whether forty-eight hour visitation could be scheduled so that the Child would be with the Mother for church, the Mother suggested that the Father bring her back earlier. Regarding the conflict, the court made only the following comment: "I'm not promoting anybody's religion by saying this. But I think this child needs the stability of, what we always say, our own church. And I think this child needs that stability."

By expressing concern that the Child experience the stability of her own church, the trial judge's comments could be interpreted as stating a preference for the Mother's religious views. In *Neely,* we found such a preference to be unacceptable absent a showing that exposure to the father's views would harm the child.[1] As this court has stated, it "should attempt, to the extent warranted by the facts, to devise a custody and visitation arrangement that interferes with the parent/child relationship as little as possible." *Neely*, 737 S.W.2d at 542. It is clear that the Father's rights would have been violated had the lower court followed the Mother's suggestion and ordered

---

[1] While the Father testified that his church was "not to the norm of certain churches" as it included healing services, hand clapping, and speaking in tongues, the record contained no proof that the child would be harmed by exposure the these practices.

the Father to return the Child in time for church. However, it is less clear when the court, in an effort to gradually ease the child into a relationship with her father, had only expanded visitation to twenty-four hours.

In order to ensure that the Father's rights are not violated, we vacate the visitation order and remand this case to the trial court for a rehearing on the question of the Father's visitation rights. The number of hours or days is left to the trial judge's discretion in light of the proof to be offered, but the determination cannot be based on a preference for one parent's religious views, unless the proof shows that exposure to the other parent's views would be harmful to the Child.

We remand this case to the trial court for a determination of the Father's visitation rights in accordance with the principles set out in this opinion. Tax the costs on appeal equally to the appellant and to the appellee.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
WILLIAM C. KOCH, JR., JUDGE