IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2000 Session

# ANGELINA ROSE KEELE (ACOSTA-DELGADO) CLIFTON v. CARLOS ACOSTA-DELGADO

**An Appeal as of Right from the Circuit Court for Davidson County**
**No. 93D-3662     Muriel Robinson, Judge**

---

**No. M2000-00253-COA-R3-CV - Filed November 15, 2000**

---

This is a post-divorce child custody dispute. The mother filed a petition to regain custody of the parties' three children after she had entered into an agreed order in 1995 granting custody to the defendant father. After hearing testimony on, *inter alia*, the father driving while intoxicated with the children in the car with him, the trial court found a material change in circumstances, granted custody to the mother, and ordered the father to pay child support. The father appeals, arguing that there was not a material change in circumstances sufficient to warrant a change in custody, that the trial court inappropriately considered his child support arrearage prior to the 1995 agreed order, and that the trial court miscalculated his income, resulting in an unreasonably high child support award. We affirm, finding a material change in circumstances warranting a change in custody, and finding that the evidence does not preponderate against the award of child support.

**Tenn.R.App.P. 3; Judgment of the Circuit Court is Affirmed.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S.,and WILLIAM B. CAIN, J., joined.

John M. Cannon, Goodlettsville, Tennessee for Appellant, Carlos Acosta-Delgado

Stephanie C. Hatchett, Nashville, Tennessee for the Appellee, Angelina Rose Keele (Acosta-Delgado) Clifton

## OPINION

In this post-divorce child custody case, Angelina Rose Keele (Acosta-Delgado) Clifton ("Mother") sought to regain custody of the parties' three boys from their father, Carlos Acosta-Delgado ("Father"). Mother and Father were divorced on January 11, 1994, on the grounds of irreconcilable differences. At the time of trial in January 2000, the oldest child, Jason, was ten years old, and the two younger boys, twins Joshua and Justin, were nine years old. Under the Marital Dissolution Agreement signed by the parties, Mother was granted primary physical custody of all three boys, with Father having visitation rights every other weekend. The Marital Dissolution

Agreement provided that the Father was obligated to pay $115.00 per week to Mother as child support.

A year later, on January 9, 1995, Mother and Father signed an agreed order modifying their Marital Dissolution Agreement. The agreed order granted primary physical custody to Father, granted visitation rights to Mother every Thursday evening and every other weekend, and provided that Mother would pay child support to Father in the amount of $49.22 per week. The agreed order stated that "the parties' [sic] have agreed that both parties are fit and proper persons to have custody and control of the three minor children . . . ."

On March 16, 1999, Mother filed a petition seeking emergency custody of the three children. In her petition, Mother asserted that Father used alcohol excessively, had been arrested for driving under the influence while the children were in the car with him, had female companions that were an unhealthy influence on the children, and was an habitual user of cocaine and other illegal drugs. Mother also contended that Father had regularly denied her visitation with the children, that he showed undue favoritism to the older child, Jason, over the younger twins, that he allowed Jason to physically assault the younger twins, and that he refused to seek counseling for Jason despite the fact that, on occasion, Jason had choked the younger children. Mother also argued that the children's school grades had declined as a result of Father's custody. Mother sought emergency custody and permanent custody, asked the trial court to find Father in civil or criminal contempt for violating the agreed visitation schedule, and sought a judgment for past-due child support.

After finding that Father was indigent, the trial court appointed counsel to represent Father with regard to the criminal contempt charges. Because the appointed attorney could not represent Father with regard to the civil contempt charge, the issues were bifurcated for hearing by the trial court. Mother later amended her petition to drop the charge of civil contempt. The disposition of the criminal contempt charge against Father is not in the record before this Court.

On July 12, 1999, Father filed a petition for contempt against Mother for failure to pay child support according to the 1995 agreed order. The petition asserted that, as of May 3, 1999, Mother owed Father $11,074.50 in child support. Mother filed a response stating that she and Father had agreed that she would not pay the weekly child support under the agreed order. Nevertheless, on October 28, 1999, Mother was sentenced to thirty days incarceration for her failure to pay child support. On October 29, the trial court entered an agreed order stating that Mother would be released from jail upon her deposit of $6,242.59 into the Circuit Court Clerk's office. The money was paid, and Mother was released that day.

The hearing on Mother's petition for custody was held on January 11, 2000. At the outset of the hearing, Mother testified in response to questions, from the attorneys as well as from the trial court, about the reason why she agreed to transfer physical custody of the boys to Father in 1995. Mother testified that, before the parties separated, she stayed at home with the children and did not work outside the home. After Mother moved out with the children, she said she had great difficulties working and getting the children to day care. Although the divorce decree in January 1994 provided

that Father would pay $115 per week in child support, Mother stated that Father refused to pay it. She asserted that Father "continually harassed" her at her job, and that she was fired as a result of his harassment. Mother testified that, after losing her job, she was unable to financially support the children and had no money to hire an attorney to enforce the child support order. Consequently, in January 1995, she agreed to a consent order granting physical custody of the boys to Father.

The January 1995 order provided that Mother would pay Father child support in the amount of $49.22 per week. Mother testified that she and Father orally agreed that Mother would not pay the child support listed in the January 1995 order because of Father's child support arrearage. Nevertheless, when Mother filed her petition to change custody, Father responded by filing a petition for contempt, claiming Mother had not paid child support as required under the January 1995 order. Mother was jailed, and was released after she paid the alleged arrearage.

Mother then testified regarding Father's interference with her visitation, as well as his vile language and behavior toward the boys and in their presence. She described Father sending her on "wild goose chases" to Murfreesboro and other locations, purportedly to pick up the children. When Mother called to ask that the boys be ready when she got there, Father responded in the boys' presence that they would be there with their "dick in their hand." She asserted that Father favored the oldest son, Jason, permitting him to play basketball while not allowing the twins to play, encouraging Jason to fight with the twins, calling the twins "faggots . . . dumb-a's . . .[and] sissy girls," and mocking the boys' speech impediments.

Mother testified that, since the January 1995 consent order, she has remarried, and that she and her husband, Van Clifton, have a two-year-old daughter. Mother stated that if she were awarded custody, she would stay at home with the children. She stated that she and her husband do not drink alcohol or take drugs, and that she would seek counseling for the boys if she were awarded custody. She maintained that her husband was a good stepparent.

Mother's testimony regarding Father's language and behavior in the presence of the children was corroborated by other witnesses, including Father. Mother's sister, Carrie Gober, was declared a hostile witness in her examination by Mother's counsel, because she remained friends with Father and often visited him during periods of time in which Ms. Gober and Mother were estranged. She confirmed that Father called the boys names like "dumbass" and asked girlfriends to "suck his dick"[1] within earshot of the children. She testified that Father laughed about sending Mother on a "wild goose chase," telling Mother that the children were in Murfreesboro when they were not. Ms. Gober

[1]After Ms. Gober recounted this comment, the trial judge and the witness had the following colloquy:
The Court: Is that the way he talks to women?
The Witness: Well, no, not all the time, but, you know, Carlos is just –
The Court: I don't know Carlos, so I'm asking you.
The Witness: I mean, that's just Carlos' nature.
The Court: Well, did that offend you?
The Witness: Did it offend me?
The Court: Yeah.
The Witness: No.

stated that she had seen Father use cocaine on more than one occasion since he had taken custody of the boys.

Mrs. Gober's son Troy also testified, confirming that he had heard Father make sexual comments about women in the boys' presence and that he had heard Father call the boys "sissy, little girl, faggot" and that Father would grab the boys by their heads and jerk them.

There was considerable testimony regarding Father's excessive drinking and incidents in which he drove intoxicated with the children in the car with him. Ms. Gober testified that she had seen Father "obviously drunk" in the presence of the parties' children, and had on occasion driven the children herself because Father was "too drunk to drive them," and that she had seen Father drive the children while under the influence of alcohol. In his testimony, Father admitted that he had been arrested three times for driving under the influence of alcohol. The first arrest occurred in 1985, prior to the parties' divorce, and was later dismissed. Father's second arrest occurred in February 1997 in Wilson County for driving under the influence, child endangerment, and resisting arrest. The indictment following that arrest indicates that Father had his three children and another child in the car with him when he was arrested. The child endangerment charge was later dropped, and Father pled guilty to driving under the influence and resisting arrest.

Father's third arrest occurred in Davidson County on April 10, 1999. During the trial court's hearing, two police officers, the parties' oldest son, and Mother's thirteen-year-old nephew testified as to the events of that night. Father, his three sons, and the thirteen-year-old nephew spent the evening at a bowling alley. The first police officer was working off-duty as a security guard at the bowling alley. He testified that the night of the arrest was the second time in two weeks that he had seen Father drinking and acting in a belligerent manner. On the night in question, Father let the children bowl while he was drinking in the bar. After some time had passed, the four children stopped bowling and came into the bar. The police officer told Father that the children were not allowed in the bar. Father reacted in a belligerent fashion and did not immediately remove the children from the bar. The nephew testified that Father said that he was "going to smack that 'MF'ing cop" when the officer told him to remove the children from the bar. The nephew stated that, as Father and the children left the bowling alley, Father said "I'm going to run over these pigs." The police officer working as the security guard called the police to prevent Father from leaving the bowling alley with the children in the car. After Father got into the car to drive, with the children in the car, the nephew testified that Father "burned out" and "sped around the bowling alley" before being stopped by a police car with its lights on. The police officer then administered field sobriety tests and arrested Father. The nephew testified that, at this point, Father began "jerking away and fighting" the arresting officers, so one of them "slammed him down and put the cuffs behind his back." Father later registered a blood-alcohol content of .22. The boys stayed that night with Crystal, a sixteen year old girl who worked at the bowling alley. The nephew testified that, when Father returned home the next morning from jail, "he had an open beer in his hand and was drinking it."

Father testified that he served the required jail time and was on probation as of the date of the hearing. He asserted that he had not had anything to drink for over eight months prior to the hearing, and attended Alcoholics Anonymous meetings once a week as required under the terms of his probation.

Father asserted that Mother's husband, Van Clifton, physically mistreated the children when they were at Mother's home. The testimony was disputed regarding incidents at Mother's home. The parties oldest son, Jason, testified that Mr. Clifton once kicked him in the back, causing him to fall down several steps. On cross-examination, Jason acknowledged that he, Jason, had been slapping his younger brother, and when Mr. Clifton attempted to stop Jason, Jason ran from him. Jason also testified that, on another occasion, Mr. Clifton spanked him with a yardstick, breaking it in half. Jason acknowledged that Father disciplines the boys by spanking them with a belt. Mr. Clifton also testified about these events. He testified that he did not kick Jason down the steps. He said that he looked out the window and "Jason had one of his brothers up in the corner on the deck kicking him like you'd punt a football." When Mr. Clifton came out to stop the altercation, that Jason ran from him and tripped going down the stairs to the deck. Mr. Clifton acknowledged spanking Jason with a yardstick but said that he is a transplant patient and must limit his physical activities.

Father testified that he was involved at the children's school and helped them with their homework. The principal at the boys' school, Patty Evans, testified that she saw Father daily and that he regularly attended meetings regarding the children. Ms. Evans said that the boys' grades were usually good and that their attendance was average. Both Ms. Evans and the boys' special education teacher testified that Father was an involved, supportive parent and that the boys seemed happy to see him. In her testimony, Mother acknowledged that "when [the children's] daddy's sober, I don't doubt that he's a good father."

At the hearing, there was also testimony on both parties' allegations regarding child support arrearages, as well as Father's income. Father testified that he is self-employed, doing painting and remodeling. During Father's direct examination, the trial judge questioned him regarding his income:

By Mr. Cannon [attorney for Father]:

Q.     What is your gross annual income?
A.     I haven't had – being self-employed I haven't really had a gross because I'm getting started. Since I filed taxes it was almost $10,000 last year and the year before also.
Q.     That's $10,000 that you actually made?
A.     A year, right.
Q.     Over and above your cost and expenses?
A.     Right.

THE COURT: That's ridiculous.

THE WITNESS: That's what it is.

THE COURT: Then I can impute $25,000.

* * *

THE COURT: He doesn't keep records?

THE WITNESS: I don't have records. I filed – it was about $10,000.

THE COURT: That's what you filed on but that doesn't mean that's what you make.

THE WITNESS: That's what I made.

THE COURT: Wait a minute. You don't want me to think that you are not a credible witness because here you have three children that you have supported and paid rent and done all this stuff –

THE WITNESS: I have worked for the landlord and he knocks my rent off and I didn't file that.

THE COURT: Will you be quiet and let me make a statement[?]

THE WITNESS: Okay.

THE COURT: If you don't show that you have sufficient income to support the children, then we might as well stop this right now. And if you're going to tell me all you make is $10,000, then we might as well stop the case right now because you're not – you're not – you're not financially able to care for three children.

THE WITNESS: Well, I didn't consider the rent that I'm not paying because he – I pay 650 a month for my rent. I do – I paint an apartment for him and he'll knock a month – that pays my rent. He owns like 25 houses and duplexes. Every time I paint one, he knocks off –

THE COURT: Give me a straight answer on your income, sir. Mr. Cannon, did you go over – this is very crucial –

THE WITNESS: I'd say 25,000 a year.

THE COURT: Sir, you need to be quiet while the Court's talking. That's part of your problem here. You don't respect those that try to help you out in any way.

Now, as his lawyer, I want you [Mr. Cannon] to develop his finances here, because if he's going to tell me he makes on 10,000 a year, I cannot vest custody of these children back with him.

After the hearing, the trial court observed that, at the time of the January 1995 order transferring custody from Mother to Father, had the trial court known the circumstances, it would have been "very hesitant about changing custody" and found that the consent order in January 1995 "was probably a mistake." She faulted Mother for agreeing to change custody, knowing of Father's drinking habits, instead of having the child support provision of the original divorce decree enforced. Citing Father's excessive drinking, use of drugs, DUI arrests, foul language and disrespectful behavior, the trial court awarded custody to Mother. Father was ordered to attend parenting classes for four months. He also was enjoined from drinking alcohol while he has the children, from transporting the children in a car while under the influence of alcohol or any other intoxicant, and from using foul or disrespectful language in the children's presence. Mother was awarded $127.62 per week in child support. As to the past arrearages, the trial court found that Mother owed Father

$4,740 in child support arrearages, and Father owed Mother $5,287.62 in child support arrearages. Consequently, the offset sum of $547.62 was awarded to Mother. From this order, Father now appeals.

On appeal, Father raises three principal issues. He argues first that the trial court erred when it considered circumstances prior to the 1995 agreed order in deciding to grant custody to Mother. Second, Father contends that the trial court erred in finding a sufficient material change in circumstances to justify the modification of the agreed order and award custody to Mother. Lastly, Father argues that the trial court miscalculated his annual income, resulting in an unreasonably high award of child support.

As in all child custody cases, we review the trial court's decisions *de novo* upon the record before this Court, accompanied by a presumption of correctness in the trial court's factual findings. ***See Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 838 (Tenn. Ct. App. 1997). In child custody cases, the welfare and best interests of the children are the paramount concerns. ***Whitaker***, 957 S.W.2d at 837; Tenn. Code Ann. § 36-6-106 (1996). The determination of the children's best interests must turn on the particular facts of each case. ***See Taylor v. Taylor***, 849 S.W.2d 319, 326 (Tenn. 1993); ***In re Parsons***, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995).

Father's first argument is based upon the doctrine of *res judicata.* He argues that *res judicata* should bar the trial court from considering any of the circumstances surrounding the January 1995 agreed order changing custody to Father, and points to statements by the trial judge characterizing the agreed order as a "mistake."

When an order is issued granting custody of children to one parent over the other, that decree is *res judicata* and is conclusive as to the issues in question at the time the order is issued. ***See Dodd v. Dodd***, 737 S.W.2d 286, 290 (Tenn. Ct. App. 1987), *appealed on other grounds after remand*, 1991 WL 10970 (Tenn. Ct. App. Feb. 5, 1991); ***Walker v. Walker***, 656 S.W.2d 11, 16 (Tenn. Ct. App. 1983). A decree granting custody, then, should not be disturbed "unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change in custody." ***Dodd***, 737 S.W.2d at 290.

The doctrine of *res judicata* is a principle of claim preclusion that promotes finality in litigation. ***See Lien v. Couch***, 993 S.W.2d 53, 55 (Tenn. Ct. App. 1998). *Res judicata* bars "a second suit between the same parties . . . on the same cause of action with respect to all the issues which were or could have been litigated in the former suit." ***Id.*** at 56. It does not prohibit "reexamination of the same question between the same parties when the facts have changed or new facts have occurred that have altered the parties' legal rights and relations." ***Id.*** The doctrine of *res judicata* is not applicable in this case to bar the trial court from considering the facts surrounding the January 1995 agreed order. In her petition, Mother alleged a material change in circumstances which warranted a change in custody. In order to make this determination, it was necessary for the trial court to ascertain the circumstances surrounding the January 1995 order, including Father's refusal

to pay child support under the original decree. Thus, it is a "reexamination of the same question" in light of new facts. *See id.* This issue is without merit.

Father next argues that there was not a material change in circumstances sufficient to warrant a change in custody. Father contends that the trial court punished him for his drunk driving by awarding custody to Mother, and that it was required to credit his testimony that he stopped drinking in May 1999, since this testimony was unrefuted.

In Tennessee, there is a strong preference for maintaining continuity in a child's life by preserving an initial custody order and not moving the child from one parent to the other. *See Placencia v. Placencia*, 3 S.W.3d 497, 503 (Tenn. Ct. App. 1999). However, custody can be changed upon a showing that there has been a material change in circumstances. *See id.* at 499; *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn. Ct. App. 1995). The change in circumstances must be such that the welfare of the child is directly affected. *See Massengale*, 915 S.W. 2d at 819 (citing *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn. Ct. App. 1981)). Further, the change in circumstances must present a risk of "substantial harm" to the child in order to justify modification of the original custody order. *See Wall*, 907 S.W.2d at 834. The court should only consider the interests of the child, and it should not revoke a custody order to punish a parent for wrongdoing. *See id.*

In this case, there was ample evidence of a material change in circumstances sufficient to justify a change in custody. The evidence showed that, since the January 1995 consent order, Father had used cocaine, called the children demeaning names, undermined Mother's visitation by sending her on "wild goose chases," regularly used vile and profane language in the children's presence, made coarse sexual remarks in their presence, regularly became intoxicated while the children were in his care, drove intoxicated with the children in his car, and resisted arrest for driving while intoxicated. In the face of such evidence, for Father to argue that the trial court was required to leave the children in his custody, because his testimony that he had changed his ways was "unrefuted," defies common sense. His promises of reform ring hollow when viewed in light of a course of conduct demonstrating persistent disregard of his obligation to act in his children's best interest.

Father argues next that, even assuming a material change in circumstances, changing custody was not in the best interest of the children. *See, e.g., Williams v. Williams*, No. 01A01-9610-CV-00468 at **8-**9 (Tenn. Ct. App. May 23, 1997). He points to evidence that Mr. Clifton physically abused the boys by kicking Jason and spanking the boys with a yardstick. He also notes testimony from the school principal and the boys' teacher that Father is an involved and supportive parent. As acknowledged by Mother in her testimony, Father may be a good parent when he is sober. This does not outweigh the many instances in which Father demonstrated flagrant disregard for the well-being of his children. Moreover, the evidence regarding the alleged abuse by Mother's husband was disputed. The trial court apparently credited Mr. Clifton's explanation of the events, finding that he had "not in the past done anything that would be detrimental to these children. . . ." The trial court, of course, is in the best position to determine the credibility of the witnesses. *See Collins v. Howmet*

***Corp.***, 970 S.W.2d 941, 943 (Tenn. 1998). Consequently, we find no error in the trial court's decision to award custody to Mother.

Father's last contention on appeal is that the trial court erred in calculating his income, resulting in an unreasonably high award of child support. Father argues that the trial court forced him to testify to an income higher than what he actually makes. He contends that the trial court forced him to testify to an income of $25,000 per year, when in fact that is the amount of his gross receipts for his painting and remodeling business. He asserts that he was forced to testify to the higher level of income by the trial court's threat to take custody of the children away from him. He argues that this was an abuse of discretion by the trial judge and demonstrates the bias she held against him from the beginning of the custody hearing. Indeed, the trial judge was openly skeptical of Father's testimony, particularly his assertion that he supported himself and the parties' children on only $10,000 a year from his self-employment.[2] It is the trial judge's job to evaluate the witnesses' credibility. In this case, the trial judge apparently imputed an income of about $25,000 to Father, because she ultimately set his child support obligation at $553 per month. The Child Support Guidelines published by the Tennessee Department of Human Services indicate that a gross income of $25,761 per year should be imputed if the person obligated to pay child support fails to produce evidence of his or her income and there is no other credible evidence of the obligor's income or income potential. ***See Rules of Tenn. Dept. of Human Services***, Chap. 1240-2-4.03(3)(e). The record does not reflect that Father provided any evidence, other than his own testimony, that his income was lower than $25,000. Under these circumstances, we cannot conclude that the trial judge erred in imputing $25,000 of gross annual income to Father. The decision of the trial court is affirmed.

The decision of the trial court is affirmed. Costs are assessed against Appellant, Carlos Acosta-Delgado, and his surety, for which execution may issue if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE

_____

[2]In response to Father's assertion that he could not afford health insurance for his children, the trial judge observed that he came to court wearing expensive gold jewelry.