IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 15, 2006 Session

## VANESSA ANN WEBSTER
v.
## BRAD ANTHONY WEBSTER

**An Appeal from the Chancery Court for Madison County**
**No. 61264     W. Michael Maloan, Chancellor**

**No. W2005-01288-COA-R3-CV - Filed October 24, 2006**

This is a parental relocation case. The parties were divorced and, under their MDA, the mother was designated the primary residential parent for the parties' two children. Within a month after the divorce decree was entered, the mother wrote the father a letter saying that she was moving to Canada with the children. The father filed an objection to the relocation in the trial court. The mother filed a response and a petition to relocate with the children to Canada, stating that she intended to marry a citizen of Canada who was currently serving in the Canadian armed services. After a hearing, the trial court denied the mother's petition, finding that the relocation did not have a reasonable purpose and that the relocation was not in the children's best interest. The mother now appeals. We reverse, holding that the evidence preponderates against the trial court's finding of no reasonable purpose under the parental relocation statute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

David W. Camp and Bob C. Hooper, Jackson, Tennessee, for the appellant, Vanessa Ann Webster.

Barbara Hobock and Cynthia Chandler-Snell, Humboldt, Tennessee, for the appellee, Brad Anthony Webster.

## OPINION

Plaintiff/Appellant Vanessa Ann Webster ("Mother") and Defendant/Appellee Brad Anthony Webster ("Father") were married in August 1997. They had two children during the marriage,

Savannah Lee Webster (born January 26, 1998) and Virginia Lynn Webster (born November 26, 1999). At all pertinent times, the parties and the children lived in or near Jackson, Tennessee.

In August 2003, Mother filed a petition for divorce and the parties separated. On December 3, 2003, the parties executed a permanent parenting plan which designated Mother as the primary residential parent and provided that Father would have parenting time every other weekend and on alternating Wednesdays. On December 4, 2003, the parties executed a marital dissolution agreement ("MDA"), which set out the remaining terms of the parties' divorce. On December 23, 2003, the trial court entered a final decree of divorce, incorporating by reference the parties' MDA and permanent parenting plan.

In October 2003, Mother met Captain Daniel Belanger ("Belanger"), a fighter pilot for the Canadian Air Force, when he came to Jackson for an air show. On January 15, 2004, less than a month after the divorce was made final, Mother sent Father a letter informing him that she was "moving to Canada with the girls." She stated no reason for the move, except that it was "in the best interest of the girls." She said that she hoped to work out an arrangement with Father without using lawyers. In the letter, Mother suggested that Father have custody of the girls for eight weeks in the summer, two weeks at Christmas, and one week during spring break, which would enable Father to spend more days with the children than under the agreed-upon parenting plan. In this way, Mother stated, the children could have a more stable home environment without the weekly "back-and-forth living." In addition, they could be exposed to a different culture in Canada and could learn to speak French. She asked for Father's cooperation for the benefit of the girls, because her move was going to "happen no matter what."

Not surprisingly, Father objected. On January 26, 2004, Father filed a petition opposing Mother's proposed relocation of the children. In his petition, Father pointed out that Mother's letter failed to state the location of her proposed new residence or the reason for the proposed relocation, and also failed to notify him of his right to file opposition to the move within thirty (30) days of her letter, all of which was required by statute. *See* T.C.A. § 36-6-108(a) (2005). In his petition, Father surmised that Mother's reason for moving to Canada was to be with a man she had recently met. Father asserted that Mother's proposed move did not have a reasonable purpose, that it would pose a threat of specific, serious harm and result in severe emotional detriment to the children, and that it was not in the children's best interest. In the event that the trial court found that moving to Canada with Mother was not in the best interest of the children, Father asked the court to designate him as primary residential parent and grant Mother reasonable visitation.

Several months later, on May 7, 2004, Mother sent Father another letter informing him that she intended to marry and move with the children to Canada. On August 27, 2004, Mother filed a response to Father's opposition to her proposed relocation and a counter-petition to modify the final decree of divorce. Mother stated that she intended to marry a citizen of Canada who was currently serving in the Canadian armed services, and she requested that the permanent parenting plan be modified to allow her to relocate with the children.

In August 2004, Chancellor J. Steven Stafford appointed Carl E. Seely as the guardian ad litem for the children. Subsequently, of his own volition, Chancellor Stafford recused himself, and Chancellor W. Michael Maloan was assigned the case.

On December 22, 2004, a hearing was held on Mother's proposed relocation. The trial court heard testimony from the parties and from Mother's fiancé, Daniel Belanger, and some of the parties' family members.

Belanger testified at the outset. He said that he is a Captain with the Canadian Armed Forces, and had served as a fighter pilot with the Canadian Forces since 1988, living in Quebec, a French-speaking city in Canada. Belanger said that he would have enough time in the Canadian Armed Forces to retire in approximately two and a half years, but he planned to stay in the armed forces for about seventeen more years. He testified that he could not move to Tennessee because, if he did, he would lose his job with the Canadian Armed Forces. He said that he had recently taken a desk job with the Canadian Armed Forces in order to be home more. Belanger said that he is generally subject to being transferred, but would not be transferred in the next three years and, after that, could simply retire if presented with a proposed transfer that was unacceptable.

Belanger testified that he met Mother at an air show in Jackson in October 2003, at a time when she was separated from Father and Belanger had separated from his wife. Belanger's divorce from his wife was final in November 2003. He and Mother started talking about marriage in January 2004 but had not set a date for the wedding because they were waiting for resolution of Mother's petition to relocate. Belanger said that he anticipated that he and Mother would marry before she and the children relocated to Canada.

Belanger has two daughters of his own, ages five (5) and nine (9), at the time of the hearing. Belanger's daughters lived primarily with their mother, about eight miles from Belanger, but he said that he has residential parenting time with them between 40% and 50% of the time. One daughter is bilingual, able to speak English and French, and the other speaks only French. He said that Mother's children, who were five and six years old at the time of the hearing, had visited Canada twice. Belanger's daughters were present during both of their visits, and the children all interacted well.

Belanger testified that, if the children were allowed to relocate to Canada, they would obtain dual citizenship and learn to speak French. Initially Mother and the girls would live with Belanger on the military base in his three-bedroom house. He said that Quebec is French-speaking but the military base is bilingual. The children would have the choice of going to either a nearby French school or an English school about five miles away from the military base. He noted that health care in Canada is free, and said that schools and colleges were comparable to those in the United States. Belanger said that, if the Mother and the girls lived in Canada and an emergency arose that prevented Mother from caring for the children, he would accept the responsibility for caring for Mother's daughters.

Belanger testified that, if Mother's children were allowed to relocate to Canada, Father could have visitation with his children "[a]s often as he wants." He emphasized that "the last thing in our mind [was] to deprive the children from their father." Belanger said that, in order to help the children communicate with Father, he would "make everything available technically . . . with e-mails, telephone, travel arrangements, everything possible to make it happen."

Mother testified as well. Prior to the hearing, Mother had a job with the Jackson Chamber of Commerce earning $42,000 per year, but she quit that job in July 2004 to spend time with her children and to await the outcome of her request to relocate. At the time of the hearing, she was writing a children's book and doing freelance graphic design work on the computer designing logos. She and the children were living off of the child support from Father and proceeds from the sale of her home.

Mother married Father when she was twenty-three. She admitted that she and Father divorced after she had an affair with someone else. In August 2003, after Mother filed for divorce, Father reluctantly moved out of the marital home.

Mother admitted that, when she and Father negotiated their permanent parenting plan, in response to his questions, she assured him that she would not try to move with the children to Texas, where her family was located. At that time, Mother testified, she did not anticipate that she would want to move to Canada. By January 2004, however, she had met Belanger and told Father that she wanted to move to Canada with the girls. As background, Mother said that her parents divorced when she was five, and she moved with her mother to Texas to be near her mother's family. Mother spent time with her father during the summers and on Christmas holidays. Mother said that, as a child, she enjoyed this arrangement and believed it was better for her than the standard every-other-weekend visitation, because she had longer periods of time with her father.

In February 2004, Mother testified, she spent about four weeks in Canada investigating relocating there, while Father stayed with the children in Mother's apartment in Jackson.[1] Mother concluded that Canada "would be a very wonderful place for the three of us to live." The results of Mother's investigation were compiled in a notebook that Mother used in her testimony. Mother testified that her investigation of the Canadian school system indicated that it is much like the school system in the United States. The parties' children would be in an English school and would be taught French as a second language. Father's medical insurance would be accepted in the Canadian health system, and after residency has been established for six months, health care is free. Mother determined what the children would need on trips between the United States and Canada, such as passports and parental consent letters. She did not anticipate any problems with the children's travel.

In April 2004, Mother took the girls to Canada to visit with Belanger. She did not inform Father of the trip until she and the girls were already in Canada, because the trip did not interfere

_____

[1]Mother testified that Father was living in a hotel at the time, so she offered to let him stay with the girls in her apartment, and he agreed.

with his regularly-scheduled parenting time. In May 2004, Mother sent Father another letter telling him that she intended to marry Belanger and describing the type of place in Canada in which she and the children would be living. She asked Father to work with her to plan a mutually agreeable visitation schedule. Mother said that, at the time, she had not told the children that she intended to marry Belanger and move to Canada. However, the girls' paternal grandmother, Alice Williams ("Williams"), told the girls about Mother's impending marriage, told them that Canada was far away, and that, if they moved there, they would never see their cousins again.

Mother asserted that she had thoroughly investigated every aspect of the proposed move to Canada, considering the children's well-being and safety, and had determined that living in Canada would be beneficial for the girls. She submitted into evidence several photographs showing facilities in Quebec, such as the children's proposed school, a ballet academy, the military base where they would live, a hospital, and a hotel where Father could stay when he visited, as well as photographs of Belanger, Mother, and their four children on vacation in Canada. Mother said that, if relocation to Canada were permitted, Father could visit the children whenever he wanted to see them. Under the parenting schedule she was proposing to the trial court, Father would have the children one week in April, one week at Christmas (odd years) or Easter (even years), and four weeks in the summer. Mother said that she would be willing to make all of the travel arrangements, finding the cheapest airfare for everyone.

Initially, Mother testified that she intended to try to find a full-time job in Canada that offered benefits. In her later testimony, she said that, if permitted to relocate, she envisioned being home with Virginia and Belanger's younger daughter, who are the same age, and going to lunch with Savannah, who would have an hour and a half for lunch at school.

Mother was questioned about the children's relationship with their extended family. Apparently the paternal grandmother, Williams, babysat with the children fairly often, usually a few hours at night, sometimes overnight. She said that their paternal grandfather, Don Webster ("Webster"), lives in Kentucky and rarely sees the children. Father's sister, Leslie Cook ("Cook"), was only minimally involved with the children while the parties were married. Mother testified that her mother, Jan Meadows ("Meadows"), lives in Jackson, Tennessee; Mother takes the children to see Meadows about once each week, but she rarely babysits them. Mother's father, Ed Parker ("Parker"), works half of the year in Jamaica and sees the children approximately once a month. Mother's sister, Jennifer Hughes ("Hughes"), lives in Jackson, Tennessee, and has two sons, with whom the parties' daughters were well acquainted. Generally, Mother testified, the children were loved by their extended family, but it was rare for her to call on extended family for help with the children. If she needed help with the children in Canada, Mother said, she would rely on Belanger, his nearby family members, and the family network at the military base. Mother said that, if permitted to move, she would keep the children connected with their extended family by telephone, e-mail, and webcam visits.

Mother stated that the primary reason she wanted to move to Canada was to marry Belanger and to have her children benefit from that loving home. She said it was not feasible for Belanger to

move to Tennessee, because he would lose his full pension. Mother was asked whether this was simply an adventure based on her self-described "fascination" with Canada. Mother denied this, stating that she wanted to move there to be with the man she wanted to marry and to have her children with her in a loving home.

Mother stated decisively that, if the trial court denied her request to relocate with the children, she would stay in Tennessee and "try to find a way to be with Daniel [Belanger]."

Father also testified. At the time of the hearing, he was employed as a vice president and commercial loan officer at Bancorp South and had been there for six years. He said that his hours were flexible, and that he was able to take care of the children during his parenting time.

Father testified that, prior to the divorce, he was very active in the children's lives. He said that he helped them get dressed in the morning, prepared their breakfast, got up with them when they cried at night, and prepared dinner when he came home from work. He claimed that he frequently took them to doctor appointments because he was able to leave work more easily than Mother. His mother, Williams, stayed with the parties when each daughter was born, and after that she babysat the children on occasion. Father took the girls to see his father in Kentucky at least once a month. Father's sister, Cook, has a child Savannah's age, and he said that he and the girls spend time with his sister's family when he has parenting time. Father said that he had remained close to Mother's family, particularly Mother's sister, Hughes, and their two children.

Father noted that, during the divorce negotiations, he and Mother specifically discussed his desire that Mother not move away with the children. Mother's job with the Jackson Chamber of Commerce gave her the opportunity to explore larger job markets, and she had expressed interest in moving to a bigger city. Therefore, at the time, he suspected that Mother might seek to move to Texas or to a larger city. Father claimed that Mother assured him she would never move away from Jackson. Father's family encouraged him to get Mother's promise to stay in Jackson in writing, but he did not do so because he did not think it was necessary. Nevertheless, Father said he was not surprised to receive Mother's letter telling him that she was moving with the children to Canada, because Mother had made "several bad, huge . . . choices that impacted our . . . family . . . ."

Father claimed that he was supportive of Mother's relationship with Belanger, and noted that he always kept the children during Mother's trips to Canada. Father said that he did not want the children to move to Canada with Mother because they would be fifteen hundred miles away from him and all of their other family members. He felt that the children would suffer emotional harm from having no family with them in Canada, and also because traveling to and from Canada is difficult. He observed that international travel can be complicated, noting an occasion on which he kept the children for Mother an extra night because Belanger's flight was canceled at the last minute and he had to stay another day. Father asserted that, if Mother wished to continue her relationship with Belanger, they could travel to see one another without involving the children and he would agree to keep the girls during their trips. Father feared that the distance would cause him to grow apart from his children and that he would not be informed of issues that impacted them. He did not

think that he and the girls could maintain their relationship over the internet or through a webcam. Father maintained that Mother's purpose in relocating the children to Canada was unreasonable because "it's unreasonable for somebody to meet somebody and the next month decide to move them and their children away from the rest of their family to another country." Father testified that, if Mother moved to Canada, he would be willing to become the children's primary residential parent.

Family members of the parties testified as well. Williams, Father's mother, stated that she had helped with the children often, and she considers herself to be a part of their support group. She was opposed to the move and believed that the children would suffer emotional harm from being denied time with their grandparents. Jan Meadows, Mother's mother, testified that she sees the children often, but did not feel that the children's move to Canada posed any risk of harm to them.

The guardian ad litem, Carl Seely, questioned the witnesses but did not testify at trial. His report, based on conversations with the children, was not introduced into evidence. He offered a closing argument on behalf of the children at the conclusion of the testimony, however, as did the parties' attorneys. In Seely's closing argument, he noted that the parties' daughters had indicated that they loved both of their parents but preferred to continue to live with Mother. He found no indication that Mother's desire to move stemmed from a desire to undermine Father's parental rights. Rather, it appeared to be based totally on her romantic relationship with Belanger. Seely said that he had had serious questions about whether Mother's purpose was reasonable, considering how quickly after meeting Belanger she decided to marry him and move the children to Canada. He stated:

> . . .[Q]uite honestly, if the issue [had] come up back in January [2004] I would have said, "No, it's not reasonable." . . . [Now in December 2004] I am going to have to come down on the side of relocation largely because we had a much more extended time . . . to find out whether this relationship will endure, and it seems to have.

Therefore, based on these considerations, Seely advocated granting Mother's petition to relocate.

At the conclusion of the hearing, the trial court denied Mother's relocation request. The trial court found that Canada had an adequate functioning legal system and would enforce Father's visitation rights, that Mother was neither emotionally disturbed nor dependent, and that the reason for her proposed relocation was not vindictive. Furthermore, the trial court determined that there was no threat of specific or serious harm to the children if relocation to Canada were permitted. The trial court's principal concern, however, related to the reasonableness of the move. The trial court stated:

> The [factor] that the Court is struggling with the most is the reasonableness of this relocation and I am having the same question that Mr. Seely [the guardian ad litem] has in this case, that we have a chance meeting of [Mother] and Captain Belanger in October at an air show, probably for some short period of time. Then she is divorced in December — I believe December 19 was the date and then in January 15, 2004,

there's a letter, "Brad, I am moving to Canada." And the question is the reasonableness of all of this.

Certainly I agree with Mr. Seely if this petition was heard shortly thereafter there would be no question in this Court's mind, that certainly would not be reasonable, to move to Canada with — to move to Canada to marry, without a job, without any investigation, certainly would not be reasonable.

The question in this Court's mind is whether now, in December of 2004, whether with the passage of that much time — whether it is still reasonable today and I find that it is not. I am still concerned too much about — it's too many unanswered questions in the Court's mind as to whether or not this is reasonable. [Father's counsel's] question is — was, "Is this not just an adventure," and I feel that it is really is, from the questions of the witness, of what [Mother] has testified here today, that it appears to be a romantic adventure for her and her children, and it is not in the best interest of her children for the children to leave the only area and family — extended family that they know, to move not such an extended period but to a foreign country, so I find that there is not a reasonable purpose for this relocation and it is not in the best interest of the children under the facts of this case.

On May 19, 2005, the trial court entered an order consistent with its oral ruling, stating that, "[a]lthough the relocation purpose is for remarriage and taking into consideration the circumstances, testimony and specifics regarding [Mother] and her fiancé the Court finds that the move is not reasonable and therefore is not in the best interest of the children." From this order, Mother now appeals.

On appeal, Mother argues that the trial court erred in determining that her proposed relocation did not have a reasonable purpose. She argues that relocating for remarriage is a reasonable purpose, and that Father failed to establish that her relocation request was unreasonable under the circumstances.

We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Robinson v. Robinson**, No. M2003-02289-COA-R3-CV, 2005 WL 1541861, at *2 (Tenn. Ct. App. June 30, 2005). We give great weight to the trial court's credibility determinations, as the trial court is in the best position to assess the demeanor of the witnesses. **Robinson**, 2005 WL 1541861, at *2 (citing cases); **Mitchell v. Mitchell**, No. M2004-00849-COA-R3-CV, 2005 WL 1521850, at *1 (Tenn. Ct. App. June 27, 2005). Issues of law are reviewed *de novo,* with no presumption of correctness. **Nelson v. Wal-Mart Stores, Inc.**, 8 S.W.3d 625, 628 (Tenn. 1999).

It is undisputed that Mother spends a greater amount of time with the children than Father. Therefore, Tennessee Code Annotated § 36-6-108(d) is applicable to this case. That statute provides in pertinent part:

The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

(A) The relocation does not have a reasonable purpose;

(B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

(C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

T.C.A. § 36-6-108(d)(1) (2005). Under this statute, a presumption arises in favor of the relocation request unless the opponent of the relocation can establish one of the three factors set out in subsection (d). Subsection (e) of the statute further provides that, if one of these three grounds for objection is established, the court shall consider the best interest of the child in determining whether to permit the parent to relocate with the child:

(e) If the court finds one (1) or more of the grounds designated in subsection (d), the court shall determine whether or not to permit relocation of the child based on the best interest of the child. If the court finds it is not in the best interests of the child to relocate as defined herein, but the parent with whom the child resides the majority of the time elects to relocate, the court shall make a custody determination and shall consider all relevant factors . . . .

T.C.A. § 36-6-108(e) (2005). As noted above, the trial court in this case determined that the proposed relocation did not pose a threat of a specific and serious harm to the children, and that Mother's motive for relocating was not vindictive. The trial court based its decision on the finding that the relocation did not have a reasonable purpose. Having found no reasonable purpose for the relocation, the trial court then went on to find that the move was not in the best interest of the children. Because Mother testified that she would elect to stay in Jackson if the relocation was not permitted, the trial court did not go on to make a custody determination. Therefore, the initial question on appeal is whether the evidence supports the trial court's conclusion that Mother's proposed relocation did not have a reasonable purpose.

In support of her position, Mother relies on *Clark v. Clark*, No. M2002-03071-COA-R3-CV, 2003 WL 23094000 (Tenn. Ct. App. Dec. 30, 2003). In that case, the parties were divorced by final decree in January 2001, and the mother was designated primary residential parent for the parties' two daughters. In July 2001, the mother became reacquainted with an old high school friend who lived in Richmond, Virginia. *Clark*, 2003 WL 23094000, at *1. In March 2002, the mother sent the father a letter stating that she planned to marry the friend and that she was preparing to move to Virginia with the parties' children. The father filed a petition objecting to the relocation. The trial court held that the mother's proposed relocation was reasonable under section 36-6-108(d), and that, therefore, the mother was permitted to relocate with the children, provided she and her fiancé married prior to the relocation. The father appealed, arguing, *inter alia*, that the mother's proposed relocation was not for a reasonable purpose. The appellate court disagreed. It noted that the mother's testimony

at the hearing was "forthright and consistent in the face of aggressive cross-examination, and she was able to articulate a plan and a rationale for relocation that was well thought-out and took into account the best interest of her children." *Id.* at *6. The *Clark* court also recognized that, "despite any uncertainty about the wisdom of her proposed move, the mother has shown the ability to think clearly about her plan and to prepare for its consequences." *Id.* at *7. The appellate court emphasized that the mother's fiancé was long settled in Virginia, had a career there, and could not find comparable employment in Tennessee. For these reasons, the *Clark* court affirmed the trial court's conclusion that the mother had a reasonable purpose for her relocation. *Id.*

In response, Father argues that the instant case is more like the situation in *Mitchell v. Mitchell*, No. M2004-00849-COA-R3-CV, 2005 WL 1521850 (Tenn. Ct. App. Jun. 27, 2005). In *Mitchell*, the parties divorced and the mother was designated primary residential parent for the parties' nine-year-old daughter. A few years later, the mother notified the father that she intended to move with the child to California in order to live with her new fiancé, be close to his family, and seek better employment. The father objected to the move. Pending the hearing on the proposed relocation, the mother married her fiancé. After a hearing, the trial court determined that the proposed move was not for a reasonable purpose, it posed a threat of serious and specific harm to the child, and relocation was not in the child's best interest. *Mitchell*, 2005 WL 1521850, at *1. Mother appealed arguing, among other things, that moving to California to be with her new husband was a reasonable purpose.

In *Mitchell*, the appellate court agreed with the trial court's finding that the mother's proposed relocation to California did not have a reasonable purpose and was not in the child's best interest. The *Mitchell* court observed that a parent's proposed relocation based solely on a new marriage does not always mean that it is reasonable for the child to relocate with the parent. *Id.* at *3 (citing *Schremp v. Schremp*, No. W1999-01734-COA-R3-CV, 2000 WL 1839127, at *2 (Tenn. Ct. App. Dec. 7, 2000)). It remarked that parties in such a situation frequently must make choices, and that, "while it is reasonable for a husband and wife to want to live together, marriage often requires sacrifices on the part of the husband and wife so they can share a residence." *Id.* The *Mitchell* court emphasized that no evidence was offered at trial to show why the husband could not relocate to wife's community and why it was more reasonable for the wife to move rather than the husband. Therefore, the evidence did not preponderate against the trial judge's finding that it was not reasonable for the mother to relocate with the daughter to California. *Id.*

Father also cites *Schremp*, which was relied upon in *Mitchell*. In *Schremp*, the mother, who was the primary residential parent for the parties' two minor children, sought to move to Charlotte, North Carolina, where her new husband resided. *Schremp*, 2000 WL 1839127, at *1. The new husband was a pilot with Federal Express. His work permitted him to reside in either Memphis or Charlotte and still maintain his job. For reasons not explained, he chose to reside in North Carolina. The trial court concluded that the mother's proposed reason for relocating was not a reasonable purpose. *Id.* at *3. Because the evidence indicated that there was no reason why the mother's new husband could not move to Memphis, the appellate court affirmed the trial court's finding that the proposed relocation had no reasonable purpose.

To review the trial court's decision in this case, we must interpret section 36-6-108(d)(1)(A), which states: "The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds (A) the relocation does not have a reasonable purpose . . . ." In order to do so, it is useful to review the genesis of this statute, and in particular this provision.

Some time ago, under Tennessee caselaw, the custodial parent had virtually unfettered authority to move the child away from the non-custodial parent, regardless of the reason or the effect on the child's relationship with the non-custodial parent. *See Thomas v. Thomas*, 335 S.W.2d 827, 828 (Tenn. 1960) ("[T]he mother had the right to control the child's whereabouts and the father had no voice where the child should reside . . . ."), *quoted in Aaby v. Strange*, 924 S.W.2d 623, 625 (Tenn. 1996). As the value of involving both parents in child-rearing became more widely recognized, Tennessee courts began to hold that the non-custodial parent could prevent relocation of the child under some circumstances if the non-custodial parent could prove that the move was not in the best interest of the child. *See, e.g., Walker v. Walker*, 656 S.W.2d 11, 18 (Tenn. Ct. App. 1983); *see also Taylor v. Taylor*, 849 S.W.2d 319, 322 (Tenn. 1993). The evolution of Tennessee common law on this issue continued in *Seessel v. Seessel*, 748 S.W.2d 422, 424 (Tenn. 1988). In *Seessel*, the mother sought to relocate the parties' child from Memphis to Denver, Colorado. *Seessel*, 748 S.W.2d at 422. The trial court denied the mother's petition to move. The intermediate appellate court reversed, finding no evidence that allowing the mother to move the parties' son to Denver would be adverse to his best interest. The Tennessee Supreme Court granted permission to appeal "in order to correct a misapprehension of the law in this State in reference to the burden of proof involving the relocation and removal of minor children. . . ." *Id.* at 423. It overruled *Walker* and its progeny, holding that "[t]he burden of proof in such cases remains with the [custodial parent seeking to relocate] to show that the best interests of the child will be better served by its relocation." *Id.* at 424.

This decision sparked a decided increase in litigation involving the relocation of a child by a custodial parent. *See Taylor*, 849 S.W.2d at 326 n.8. The Tennessee Supreme Court then sought to ease the resolution of such cases with further explanation of the appropriate standards in *Taylor v. Taylor*, 849 S.W.2d at 331. In a dense and somewhat confusing opinion, the Court held that much of *Seessel* remained good law, but went on to set forth a list of at least nine factors to be considered in relocation cases, along with "any related factual circumstances found by the court to be significant in a given situation, [to] be weighed individually and collectively." *Id.* at 332.

Not surprisingly, instead of clarifying and simplifying the law on relocation, *Taylor* only spawned further confusion and uncertainty. Conceding that *Taylor* was "admittedly obscure," the Supreme Court took up the issue again in *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996), the decision which provided the framework for the current statute. In *Aaby*, the divorced parents entered into an MDA which awarded custody of the parties' son to the mother and granted visitation to the father. The MDA did not prohibit the mother from moving out of state with the parties' son. *Id.* at 624. Two years after the divorce, the mother filed a petition to move to Kentucky. In her petition, she said that she had remarried, that her new husband had family in Kentucky, and that she had

found suitable employment there. The father opposed the move, asserting that it was not in the best interest of their child. He sought to have custody changed to him if the mother moved to Kentucky. *Id.*

The trial court initially denied the mother's petition to relocate. Shortly after that, the Supreme Court's opinion in *Taylor* was released. The trial court reconsidered in light of *Taylor* and granted permission for the move. The father then sought further reconsideration and eventually the trial court reversed itself again, holding that the mother had not proven that the move was in the child's best interest. The mother appealed and the intermediate appellate court affirmed the trial court's denial of the petition to relocate. The Supreme Court then granted permission to appeal in order to clarify the law. *Id.* at 624-25.

After reviewing the caselaw on relocation, the *Aaby* court reaffirmed the goals expressed in *Taylor*, that is, to "(1) limit[] judicial intervention in post-divorce family decision-making, and (2) mak[e] disputes easier of resolution if they must be litigated." *Aaby*, 924 S.W.2d at 629 (quoting *Taylor*, 849 S.W.2d at 331). The Court then set forth the standard for evaluating a relocation petition:

> . . . [W]e are convinced, again for the reasons stated in *Taylor*, that the interests of the custodial parent and the interests of the child are basically interrelated, even if they are not always precisely the same. Therefore, we conclude . . . that a custodial parent will be allowed to remove the child from the jurisdiction unless the non-custodial parent can show, by a preponderance of the evidence, that the custodial parent's motives for moving are vindictive — that is, intended to defeat or deter the visitation rights of the non-custodial parent.
>
> This conclusion does not mean, however, that a non-custodial parent's hands are tied where removal could pose a specific, serious threat of harm to the child. In these situations, the non-custodial parent may file a petition for change of custody based on a material change of circumstances. The petition would state, in effect, that the proposed move evidences such bad judgment and is so potentially harmful to the child that custody should be changed to the petitioner. . . . However, . . . testimony that removal could be generally detrimental to the child will usually not suffice to establish an injury that is specific and serious enough to justify a change of custody. A move in any child's life, whether he or she is raised in the context of a one or two parent home, carries with it the potential of disruption; such common phenomena – both the fact of moving and the accompanying distress – cannot constitute a basis for the drastic measure of a change of custody.

*Id.* at 629-630 (footnote omitted). Thus, the *Aaby* court adopted a standard which made it quite difficult for a non-custodial parent to defeat the custodial parent's petition to relocate outside the jurisdiction with the parties' child; the petition would be denied only if the non-custodial parent could prove that the custodial parent's motives were vindictive or that the move posed a specific, serious threat of harm to the child. *Id.* Since the trial court in *Aaby* had found that the mother's

motives for the proposed resolution were not vindictive, and there was insufficient evidence of specific serious harm, the court held in favor of the mother, permitting relocation. *Id.* at 630.

While the standard adopted in *Aaby* came closer to achieving the stated goals of limiting judicial intervention and easing the resolution of disputes, it was harsh indeed for non-custodial parents. This was recognized in the poignant dissent filed by Justice Penny White, who observed:

> [T]he rule [adopted by the majority], in my estimation, undermines the important efforts of those non-custodial parents who work diligently to be more than every other week-end mothers and fathers. While adjusting visitation schedules to accommodate a move aims to allow the non-custodial parent a continued relationship with the child, it does nothing to accommodate or encourage the non-custodial parent who wants to attend Johnny's choir recital; Mary's soccer game; or both children's monthly parent-teacher conferences. The rule set forth by the majority allows a custodial parent to relocate to a distance that, in effect, prohibits the important non-custodial parental involvement described above. The move could be for no reason at all, so long as it could not **be proved** that the move was "**vindictive**" or "**intended**" to defeat visitation rights. I believe that such an approach unduly impedes that which we all desire – an opportunity for children of divorced parents to have meaningful relationships with both parents despite the parents' inability to remain married.
>
> Rather than the rule set forth by the majority, I would require the custodial parent to establish some reason for the move that was unrelated to the non-custodial parent's parenting rights.

*Id.* at 631 (White, J., dissenting) (footnote omitted).

In 1998, following the court's 1996 decision in *Aaby*, and clearly in response to *Aaby*, the Tennessee legislature enacted section 36-6-108, which incorporates elements of the standard adopted by the majority in *Aaby* as well as elements advocated by Justice White in the *Aaby* dissent.[2] Under the statute, the parent spending the greater amount of time with the child who seeks to relocate "*shall be permitted*" to do so unless the parent opposing the move proves at least one of three grounds. Two of the grounds are similar to the grounds set forth by the *Aaby* majority: the parent's motive for relocating with the child is vindictive, or the relocation poses a threat of specific and serious harm to the child. T.C.A. § 36-6-108(d)(1)(B) & (C) (2005). As in *Aaby*, the examples of a "threat of specific and serious harm" make it clear that the statutory term does not mean simply the disruption

---

[2]The statute addresses the situation in which the divorced parents are spending substantially equal intervals of time with the child, which was not addressed in *Aaby*. Under those circumstances, there is no presumption in favor of or against relocation, and the trial court's decision must be based entirely on the best interest of the child. T.C.A. § 36-6-108(C) (2005). In this case, we focus on the provisions addressing the situation in which the divorced parents are not spending substantially equal intervals of time, and the primary residential parent seeks to relocate with the child.

and distress which normally accompanies a move.[3]  The statute also, however, sets forth a third ground for opposing relocation that hearkens to the dissent in *Aaby*, that is, if the parent opposing relocation proves that the proposed relocation "does not have a reasonable purpose." T.C.A. § 36-6-108(d)(1)(A) (2005).  Under the relocation statute, the court addresses whether relocation is in the best interest of the child if, and only if, the court finds that the parent opposing relocation has established at least one of the three enumerated grounds.[4]  *See* T.C.A. § 36-6-108(e) (2005).

Therefore, the relocation statute *mandates* a grant of permission to relocate unless the parent opposing relocation proves at least one of the three enumerated grounds.  The court does not reach the issue of whether the move is in the best interest of the child unless one of the grounds is proven.

Although the statute does not elaborate on the meaning of the ground that the relocation "does not have a reasonable purpose," since the statute was apparently enacted with reference to the court's opinion and dissent in *Aaby v. Strange*, we interpret the statute against that backdrop.  In her dissent, Justice White obviously emphasized the seriousness of the loss, to the child as well as the non-custodial parent, of the opportunity for the non-custodial parent to participate in the child's activities, such as soccer games and recitals, even if the activities do not fall within the non-custodial parent's designated "parenting time." *Aaby*, 929 S.W.2d at 631.  She advocated requiring the parent who proposes to relocate to establish "some reason" for the move, observing that such a rule would oblige the custodial parent to "deliberate" and "evaluate" a decision to move, without impeding "the custodial parent's freedom of movement. . . ." *Id.*  She advocated an approach that would "not destroy the efforts" of non-custodial parents "to participate more fully in their children's lives. . . ." *Id.*

While the *Aaby* dissent advocated requiring the relocating parent to prove "some reason" for the move, the statute ultimately enacted incorporated a more rigid structure.  First, the parent seeking to relocate with the child must notify the other parent of the proposed move.  T.C.A. § 36-6-108(a) (2005).  The notice must contain, *inter alia*, the relocating parent's "reasons for the relocation. . . ." T.C.A. § 36-6-108(a)(3) (2005).  If the parties cannot agree, the parent opposing relocation must file a petition stating such opposition.  T.C.A. § 36-6-108(d)(1) (2005).  The parent seeking to relocate may not do so until he or she has received the court's permission. *Id.*  The statute then provides that the court "*shall*" grant such permission to relocate unless it finds one of the enumerated grounds for denial of permission, such as the fact that the relocation does not have a reasonable purpose. *Id.*

---

[3]Statutory examples of specific and serious harm include moving the child to an area without adequate medical facilities or acceptable education facilities, or to a foreign country without a functioning legal system to enforce the rights of a non-custodial parent.  T.C.A. § 36-6-108(d)(2) (2005). *See Aaby*, 924 S.W.2d at 629-30 n.2.

[4]In this way, the relocation statute is similar to Tennessee's statutes on termination of parental rights, which permit courts to assess the best interest of the child only if one of the statutory grounds for termination are proven. *Compare* T.C.A. § 36-1-108(e) *with* T.C.A. § 36-1-113(C) (2005); *see In re Marr*, 194 S.W.3d 490, 495 (Tenn. Ct. App. 2005).

Therefore, in sum, the parent seeking to relocate is required initially to state his or her reasons for the proposed relocation. T.C.A. § 36-6-108(a)(3) (2005). The burden then is on the parent opposing the move to prove that the proposed relocation "does not have a reasonable purpose." T.C.A. § 36-6-108(d)(1)(A) (2005). If this burden of proof is not carried, the trial court is obliged to grant permission for the relocation. *Id.*

In context, it is clear that the "reasonable purpose" of the proposed relocation must be a significant purpose, substantial when weighed against the gravity of the loss of the non-custodial parent's ability "to participate fully in their children's lives in a more meaningful way." *Aaby*, 924 S.W.2d at 631. However, the statute clearly includes a presumption in favor of permitting relocation, which appears to reflect the *Aaby* majority's observation that "the interests of the custodial parent and the interests of the child are basically interrelated, even in they are not always precisely the same." *Id.* at 629. Moreover, the statute is plainly structured so that the issue of the best interest of the child *is not reached* unless and until a ground to deny relocation is established. This structure suggests that the "reasonable purpose" ground is not intended to be a guise under which the trial court goes directly to the question of whether the move is in the child's best interest, as was the common law under cases preceding *Aaby v. Strange*. This statutory structure facilitates the goals, reiterated in *Aaby*, of limiting judicial intervention and making disputes easier to resolve if they must be litigated. *Id.*

How, then, is the statute applied in the case at bar? In this case, the trial court "struggled" with evaluating the reasonableness of Mother's purpose for the move. It noted the apparent impulsiveness of Mother's decision to marry Belanger and move with the children to Canada — first meeting Belanger in a "chance meeting" in October, 2003, divorcing Father in December 2003, and announcing the impending marriage and move in January 2004. The trial court observed, however, as did the guardian ad litem, that substantial time had passed from Mother's initial announcement in January 2004 and the hearing in December 2004. Nevertheless, the trial court, after having heard the witnesses testify, concluded that the proposed relocation was "a romantic adventure for [Mother] and her children" and therefore was not for a reasonable purpose.

Clearly there is support for the trial court's observations. Mother's testimony reflects a stubbornly idealized view of the benefits to the children of the proposed move to Canada, a refusal to admit that the children would suffer any detriment whatsoever from moving away from familiar surroundings and extended family, and grievous naiveté about the impact of the relocation on Father's ability to participate in their daughters' day-to-day activities. The short time frame between Mother meeting the Canadian fighter pilot and her decision to marry him and move with her children over a thousand miles away supports the finding of Mother being swept away in a "romantic adventure."[5] Only after Father protested did Mother investigate the suitability of the surroundings and facilities in Canada for the parties' daughters. Father testified persuasively that the move would

---

[5]This is likewise supported by Mother's initial letter to Father in January 2004, announcing her decision to move with their daughters to Canada, without mentioning Belanger and extolling the advantages of living in Canada as being "in the best interest of the girls."

be much more difficult for their daughters than Mother described, and would have real adverse impact on his ability to remain close to them.

On the other hand, regardless of the impulsiveness of Mother's initial decision, by the time of the hearing nearly a year later, there was no indication that Belanger was an unsuitable person to have in the home with Mother and the children, the ramifications of the proposed relocation had been investigated, and both Mother and Belanger remained committed to marry. The testimony was undisputed that, if Belanger left Canada and moved to Tennessee, he would be required to leave his career in the Canadian armed forces and lose a pension that had been accruing some eighteen years.

If Mother's intent was simply to move with the children to Canada so that the girls could engage in winter sports and learn to speak French, clearly that would not be a "reasonable purpose" for the proposed relocation when juxtaposed against the cost of such a move to Father and the girls. Here, however, her undisputed purpose is to marry a Canadian citizen.[6] Moreover, as in *Clark v. Clark*, there is undisputed evidence that Mother's fiancé has long been settled in Canada, could not find comparable employment in Tennessee, and would suffer substantial adverse impact to his career and accrued pension rights if he moved to Tennessee. *See Clark*, 2003 WL 23094000, at *7. This is a substantial purpose for the proposed relocation. Pursuant to the statute, the court is not authorized to reach the issue of the best interest of the children unless and until the parent opposing relocation has proven by a preponderance of the evidence that the relocation does not have a reasonable purpose. Under all of the circumstances of this case, we must conclude that the evidence preponderates against the trial court's finding that the proposed relocation does not have a reasonable purpose. Therefore, this finding is reversed.

The trial court found no other ground for rejecting Mother's request to relocate. Under the statute, relocation with the child "shall be permitted" unless the court finds one of the enumerated grounds. Accordingly, we must reverse the trial court's grant of Father's petition opposing relocation. The trial court is directed to grant Mother's petition for permission to relocate, and the cause is remanded for the trial court to consider related issues such as modification of the parenting schedule.

The decision of the trial court is reversed and the cause remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are assessed against Appellee Brad Anthony Webster, for which execution may issue, if necessary.

 

 

HOLLY M. KIRBY, JUDGE

---

[6]Father does not dispute that Mother's intent to marry Belanger is genuine.